OPINION OF THE COURT
Alfred M. Ascione, J.
Plaintiff, Dr. Renee Richards, nee Richard H. Raskind, an ophthalmologist licensed to practice in the State of New York, underwent a sex reassignment operation about two years ago, at the age of 41, "at which time”, Dr. Richards avers, "for all *714 intents and purposes, I became a female, psychologically, socially and physically, as has been attested to by my doctors.” Dr. Richards says that, "I underwent this operation after many years of being a transsexual, a woman trapped inside the body of a man.”
As Dr. Richard H. Raskind, plaintiff was an accomplished male tennis player, and in 1974 ranked 3rd in the east and 13th nationally in the men’s 35-and-over tennis. Since the sex reassignment operation in 1975, plaintiff has entered nine women’s tennis tournaments and has won two tournaments and finished as runner-up in three. Most recently, Dr. Richards, now 43 years of age, reached the finals of the women’s singles at the Mutual Benefit Life Open played on August 7, 1977 at the Orange Town Tennis Club in South Orange, New Jersey.
Claiming a violation of the New York State Human Rights Law (Executive Law, § 297, subd 9) and the Fourteenth Amendment to the United States Constitution, plaintiff now seeks a preliminary injunction against the defendants, the United States Tennis Association (USTA), United States Open Committee (USOC) and the Women’s Tennis Association (WTA) "so that I shall be allowed to qualify and/or participate in the United States Open Tennis Tournament, as a woman in the Women’s Division.” The United States Open, the USTA’s national championships, is to begin on August 25, 1977, at the West Side Tennis Club, Forest Hills, New York.
Dr. Richards says that she is prevented from qualifying and/or participating in the United States Open as a woman in the women’s division since defendants require that she take a sex-chromatin test (also known as the Barr body test) to determine whether she is a female, "which test,” she says, "is recognized to be insufficient, grossly unfair, inaccurate, faulty and inequitable by the medical community in the United States for purposes of excluding individuals from sports events on the basis of gender.” Plaintiff argues that the criteria for such a test is arbitrary and capricious and does not have a rational basis.
Furthermore, plaintiff claims that she is prevented from qualifying and/or participating in the United States Open due to defendant Women’s Tennis Association’s failure to rank plaintiff as a woman tennis professional, a necessary prerequisite for qualification and participation in the United States Open.
*715 The Barr body test or sex-ehromatin test, determines the presence of a second "x” chromosome in the normal female; a male has a "y” chromosome instead, as set forth in detail below.
The sex-chromatin test was first employed by the International Olympic Committee in connection with the 1968 Olympics. The USTA first required a sex determination test for women in connection with the 1976 United States Open, after plaintiff applied to play in women’s singles in the Open in July, 1976. Plaintiff demanded that USTA waive the test requirement, which request was rejected by the USTA. However, apparently, plaintiff failed to appear at a qualifying site and, in effect, withdrew her application, rendering academic the question of the test for 1976.
The record is clear that USTA’s and USOC’s decision to require a sex determination test for the 1976 United States Open, the national championships, was a direct result of plaintiff’s application to the 1976 United States Open, and plaintiff’s frank presentation of her medical situation in a personal letter to the chairman of the United States Open, Mike Blanchard.
Apparently, until August, 1976, there had been no sex determination test in the 95-year history of the USTA national championships, other than a simple phenotype test (observation of primary and secondary sexual characteristics). It also seems that the USTA has not required the sex-chromatin test for sanctioned tournaments other than the United States Open. The USTA permits each tournament committee to make its own determination as to whether to use the chromatin test.
Eugene Scott, tournament chairman of the Mutual Benefit Life Open held in South Orange, New Jersey, in which Dr. Richards played and reached the finals, avers in an affidavit submitted in support of plaintiff’s application:
"I have invited Dr. Renee Richards to play in my tournament and, in fact, she has done so. I extended the invitation to Dr. Richards as a woman because as a tennis tournament chairman based on the information afforded to me, I recognize her as a woman.
"I rejected reliance solely on the Barr body test and instead chose to rely on the Phenotype test which concerns itself with *716 the observation of primary and secondary sexual characteristics”.
According to defendants, their primary concern in instituting the chromatin test is that of insuring fairness. They claim that there is a competitive advantage for a male who has undergone "sex change” surgery as a result of physical training and development as a male. As stated by George W. Gowen for defendant USTA: "We have reason to believe that there are as many as 10,000 transsexuals in the United States and many more female inpersonators or imposters. The total number of such persons throughout the world is not known. Because of the millions of dollars of prize money available to competitors, because of nationalistic desires to excell in athletics, and because of world-wide experiments, especially in the iron curtain countries, to produce athletic stars by means undreamed of a few years ago, the USTA has been especially sensitive to its obligation to assure fairness of competition among the athletes competing in the U.S. Open, the leading international tennis tournament in the United States. The USTA believes that the Olympic type sex determination procedures, are a reasonable way to assure fairness and equality of competition when dealing with numerous competitors from around the world. The USTA believes the question at issue transcends the factual background or medical history of one applicant.”
The defendants have submitted the affidavit of Dr. Daniel Federman, professor and chairman of the department of medicine, Stanford University School of Medicine, in support of the applicability of the Barr body test for the determination of sexual identity. Since Dr. Federman conducted no physical examination of plaintiff and he relied solely on a review of the moving papers and supporting affidavits submitted by Dr. Richards, his affidavit is therefore limited in its probative value to a general consideration of the applicability of the Barr test. It is Dr. Federman’s opinion that the Barr body test reliably and inexpensively ($15) determines the presence of a second "x” chromosome in the "normal female”. He says: "The cells of a normal female contain 22 pairs of chromosomes which are identical to those of a normal male. In addition, there is a pair of sex chromosomes. In the female, there are two like structures, two x-chromosomes. In the male, the sex chromosomes are unlike — a larger x and a smaller y.”
Dr. Federman says that the "y” chromosome is related to *717 physical characteristics in the normal male that affect an individual’s competitive athletic ability. The "y” chromosome controls the development of the testes, the source of the larger amounts of androgen (the male sex hormone) produced by the male relative to the female: "At puberty, the presence in the male of the y chromosome plus the much higher ratio of androgens to estrogens [the female sex hormone] results, on the average, in greater height, different body proportions, and a higher muscle mass than in the female. In the adult male beyond puberty, neither the removal of the testes by sex reassignment surgery, nor any subsequent treatment with estrogen can affect the individual’s achieved height or skeletal structure. Removal of the testes plus ingestion of estrogens can reduce male strength, but any such effect is partial and depends upon continued ingestion of estrogen to be sustained.”
It is Dr. Federman’s view that sexual identity is a complex pattern of which some features are immutable (the nuclear and chromosomal); some can be effaced but not converted to their opposite (the gonadal and ductal structures); some are alterable by surgery or drugs (the external genitalia and hormonal balance); and some are largely subjective (the psychological and social sex). Under no circumstances can transsexual surgery produce the internal ductal organs or the gonadal identity of the opposite sex.
The Barr body test is generally administered by having the individual rinse the mouth and obtaining a sample of cells by scraping the inner lining of the cheek. The sample is then transferred to a slide. Dye is applied and the smear is examined under a microscope. Dr. Federman describes the procedure: "The examiner typically counts 100 or 200 cells and records the percentage of the cells which show an oval concentration of dye next to the surrounding border of the nucleus of the cell. This heavy concentration of dye reveals the presence of a second x-chromosome.”
However, Dr. Federman points out, the Barr body test does not determine the presence or absence of a "y” chromosome. Individuals with chromosomal defects may not therefore be definitively classified by the Barr body test alone. The Karyotype test, involving blood sampling and culture, will, though it is more expensive ($150 — $300) and takes at least one week for the test results.
The Women’s Tennis Association (WTA) has submitted an affidavit in opposition from Jerry Diamond, its executive *718 director. Mr. Diamond avers that the WTA maintains a computerized system to rank both professional and amateur women tennis players.
"Weighted results from all WTA approved events are entered into the system in order to determine the rank of each woman player. The WTA approved tournament administer the Barr body test and that only those individuals who pass the Barr body test be allowed to participate in the tournament. The WTA will not knowingly enter into its ranking system the results of a tournament which has not utilized the Barr body test as a condition for participation in the tournament or which admits a participant who has failed the test”.
Also submitted in opposition are affidavits of women’s professional tennis players Francoise Durr, Janet Newberry and Kristien K. Shaw, each stating that based on her experience, "the taller a player is the greater advantage the player has * * * similarly, the stronger a player is, the greater advantage the player has, assuming like ability.”
In another affidavit, Vicki Berner, director of women’s tennis for the USTA, formerly the number one ranked women’s singles player from Canada, and then tour director in charge of players, asserts that she has been unable to find a record of any woman player over age 40 who has had such a successful competitive record as plaintiff, a record unparalleled in the history of women’s professional tennis.
The record shows that on June 27 and July 1, 1977, Dr. Richards went to the Institute of Sports Medicine and Athletic Trauma at Lenox Hill Hospital, selected by defendants USTA and USOC to conduct the sex determination tests for the 1977 United States Open. The Barr test was administered but "the results * * * are ambiguous”. Mr. Veras requested plaintiff to return for a Barr body retest or for the more definitive or elaborate Karyotype test. The ambiguous results were blamed on the institute’s failure to follow the "standardized procedure” in order to accomodate plaintiff’s Herpes condition on those dates.
It does not appear that plaintiff returned for further testing and, accordingly, defendants have not qualified plaintiff to play in the United States Open.
What is a transsexual? A transsexual is an individual anatomically of one sex who firmly believes he belongs to the other sex. This belief is so strong that the transsexual is obsessed with the desire to have his body, appearance and *719 social status altered to conform to that of his "rightful” gender. They are not homosexual. They consider themselves to be members of the opposite sex cursed with the wrong sexual apparatus. They desire the removal of this apparatus and further surgical assistance in order that they may enter into normal heterosexual relationships. On the contrary, a homosexual enjoys and uses his genitalia with members of his own anatomical sex. Medical science has not found any organic cause or cure (other than sex reassignment surgery and hormone therapy) for transsexualism, nor has psychotherapy been successful in altering the transsexuals identification with the other sex or his desire for surgical change. (Transsexualism, Sex Reassignment Surgery and the Law, 56 Cornell L Rev 963; also, see, Transsexuals in Limbo: The Search for a LegaL Definition of Sex, 31 Maryland L Rev 236 and The Law and Transsexualism: A Faltering Response to a Conceptual Dilemma, 7 Conn L Rev 288.)
Plaintiff’s surgeon, Dr. Roberto Granato, who performed the sex reassignment operation on plaintiff, asserts that the male genitalia of Dr. Richards were removed and that as the result of the surgery the external genital appearance of Dr. Richards is that of female. Further: "With respect to Dr. Richard’s internal sex, due to the operation I performed, one would say that Dr. Richards’ internal sexual structure is anatomically similar to a biological woman who underwent a total hysterectomy and ovariectomy.”
In addition, Dr. Granato states, that prior to and after the sex reassignment operation, Dr. Richards underwent endocrinological testing and administration of female hormones so as to change Dr. Richards’ endocrinological hormonal balance to that of a woman. The removal of the testes, the main source of androgen (male hormones), decreases tremendously the male hormones in the blood and results in a decreased muscular mass; the structure of the muscle/fat ratio of the male is changed to a feminine type, together with the development of the breasts.
Dr. Granato sees no unfair advantage for Dr. Richards "when competing against other women. Her muscle development, weight, height and physique fit within the female norm.” (Dr. Richards is six feet two inches tall and weighs 147 pounds.) Dr. Granato’s professional conclusion is that, except for reproduction, Dr. Richards should be considered a woman, classified as a female and allowed to compete as such.
*720 Dr. Leo Wollman states that he has treated over 1,700 transsexual patients including plaintiff. It is his view that Dr. Richards should be considered a female. The Barr test would classify Dr. Richards as a male and despite the fact that the chromosomes may appear to be that of a man, if she has the external genital appearance, the internal organ appearance, gonadal identity, endocrinological makeup and psychological and social development of a female, she would be considered a female by any reasonable test of sexuality.
Dr. Donald Rubbell avers that he is Dr. Richards’ gynecologist and that Dr. Richards examines as a woman and her perception of herself is entirely as a woman. Dr. John Money, a psychologist presently serving as a professor and practitioner at Johns Hopkins Medical School in Baltimore, Maryland, and who has written and edited extensively on the subject (see, e.g., Green & Money, Transsexualism and Sex Reassignment) has submitted an affidavit in support of plaintiff’s application.
Dr. Money, whom Dr. Richards has consulted professionally, states that "For all intents and purposes, Dr. Richards functions as a woman; that is her internal sex organs resemble those of a female who has been hysterectomized and ovariectomized (i.e. panhysterectomized). Also, her external organs and appearance, as well as her psychological, social and endocrinological makeup are that of a woman.”
In Dr. Money’s view, the results of the Barr body test as used by defendants, create an irrebuttable presumption as to an applicant’s sex, thereby precluding certain applicants from participating in tournaments limited to participants of one sex. In the instant case, the test is given to determine whether they are female and if an applicant fails the test, that person is prevented from participating in the tennis tournament limited to females.
Dr. Money considers the Barr test inadequate to determine sex and it is unfair to use that test as the sole criterion for determining one’s sex for purposes of participating in a sports event. He states that it is erroneous to assume that the test will be accurate in determining the sex of all individuals since there are human beings who do not belong to the statistical average with respect to their chromosome pattern (e.g., Klinefelter and Turner’s Syndromes, Androgen Insensitivity Syndrome and Testicular Feminization).
As for Dr. Richards, Dr. Money says that the Barr test *721 would work an injustice since by all other known indicators of sex, Dr. Richards is a female, i.e., external genital appearance is that of a female; her internal sex is that of a female who has been hysterectomized and ovariectomized; Dr. Richards is psychologically a woman; endocrinologically female; somatically (muscular tone, height, weight, breasts, physique) Dr. Richards is female and her muscular and fat composition has been transformed to that of a female; socially Dr. Richards is female; Dr. Richards’ gonadal status is that of an ovariectomized female.
Dr. Money’s professional conclusion, based on 26 years of professional experience as a psychoendocrinologist, is that a person such as Dr. Renee Richards should be classified as female and for anyone in the medical or legal field to find otherwise is completely unjustified. Dr. Money also believes that Dr. Richards will have no unfair advantage when competing against other women. He says that her muscle development, weight, height and physique fit within the female norm.
Measured by all the factors, including chromosomal structure, Dr. Money asserts that Dr. Richards should be classified as female and that would be a widely held conclusion of medicine today.
Finally, plaintiff submits the affidavit of women’s tennis professional star Billie Jean King, holder of hundreds of titles including Wimbledon and the United States Open, and who defeated male tennis professional Bobby Riggs on national television, in support of plaintiff’s application. Billie Jean King states that she and Dr. Richards were doubles teammates in one tournament and that she participated in two tournaments in which Dr. Richards played. It is Billie Jean King’s judgment that, "she [plaintiff] does not enjoy physical superiority or strength so as to have an advantage over women competitors in the sport of tennis.”
In this court’s view, the requirement of defendants that this plaintiff pass the Barr body test in order to be eligible to participate in the women’s singles of the United States Open is grossly unfair, discriminatory and inequitable, and violative of her rights under the Human Rights Law of this State (Executive Law, § 290 et seq.). It seems clear that defendants knowingly instituted this test for the sole purpose of preventing plaintiff from participating in the tournament. The only justification for using a sex determination test in athletic *722 competition is to prevent fraud, i.e., men masquerading as women, competing against women.
This court rejects any such suggestion as applied to plaintiff. This court is totally convinced that there are very few biological males, who are accomplished tennis players, who are also either preoperative or postoperative transsexuals.
When an individual such as plaintiff, a successful physician, a husband and father, finds it necessary for his own mental sanity to undergo a sex reassignment, the unfounded fears and misconceptions of defendants must give way to the overwhelming medical evidence that this person is now female.
This court is not striking down the Barr body test, as it appears to be a recognized and acceptable tool for determining sex. However, it is not and should not be the sole criterion, where as here, the circumstances warrant consideration of other factors.
Subdivision 3 of section 290 of the Executive Law declares that the State has the responsibility to act to assure that every individual within this State is afforded an equal opportunity to enjoy a full and productive life and that the failure to provide such equal opportunity, whether because of discrimination, prejudice, intolerance or inadequate education, training, housing or health care not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic State and threatens the peace, order health, safety and general welfare of the State and its inhabitants.
Section 296 (subd 1, par [a]) declares that it shall be an unlawful discriminatory practice for an employer, because of age, race, creed, color, national origin, sex or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.
As indicated, this court finds defendants and each of them in violation of plaintiff’s rights under the Human Rights Law and, accordingly, pursuant to subdivision 9 of section 297 thereof, plaintiff’s application for a preliminary injunction is granted in all respects.