OPINION OF THE COURT
Edward H. Lehner, J.
The issue presented by this motion by defendants to dismiss the complaint pursuant to CPLR 3211 (a) (7) is whether the law provides any protection to a transsexual against employer harassment.
The complaint, as supplemented by plaintiff’s affidavit, alleges that on January 10, 1965 plaintiff was born a female, Diane Maffei. In 1986 plaintiff commenced employment at Kolaeton Industry, Inc. (Kolaeton) and, apart from a temporary layoff in 1989, has remained in the employ of said defendant.
In January 1994 plaintiff underwent sex reassignment surgery to change his sex from female to male. The record is unclear as to what physical changes have taken place, and to what extent the plaintiff has completed his metamorphosis from a female to a male, but plaintiff today holds himself out to be Daniel Maffei.
Plaintiff alleges that prior to his transformation, he was considered an exemplary employee, who executed his duties in a stellar fashion, was frequently praised about his work performance, and received salary increases and bonuses on a consistent basis. However, after his operation plaintiff asserts that defendant Wong, the president of Kolaeton, began to degrade and humiliate him at the office, has called him names, stripped him of his duties, ostracized him from the rest of the employees and in the presence of the office manager stated that plaintiff was "immoral and what [he] did was amoral”. Plaintiff claims that this harassment has resulted in a hostile work environment and he is entitled to damages.
In addition to denying the aforesaid factual assertions, defendants contend that even if true they fail to state a cause of action because neither the Federal, New York State nor New York City law against employment discrimination or harassment recognizes transsexuals as a protected class.
In considering this motion, which has not been converted to one for summary judgment, the complaint combined with plaintiff’s supplemental affidavit "must be given their most *549 favorable intendment” (Arrington v New York Times Co., 55 NY2d 433, 442 [1982]).
The Federal law against discrimination in the workplace was enacted as part of title VII of the 1964 Civil Rights Act and provides as follows (42 USC § 2000e-2 [a]):
"It shall be an unlawful employment practice for an employer—
"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race, color, religion, sex, or national origin”.
The New York State law, which added a prohibition against discrimination based on sex in 1965, provides (Executive Law § 296):
"1. It shall be an unlawful discriminatory practice:
"(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.”
The New York City law, which is similar to the State law with one important difference — it prohibits discrimination based on sexual orientation, reads (Administrative Code of City of NY §8-107 [1]):
"It shall be an unlawful discriminatory practice:
"(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.”
In Meritor Sav. Bank v Vinson (477 US 57 [1986]), it was held that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment” (supra, at 66), but in order for "sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim’s] employment and create an abusive working environment’ ” (supra, at 67).
*550 In Harris v Forklift Sys. (510 US —, 114 S Ct 367 [1993]), the Supreme Court amplified the rules on this issue, stating:
"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII’s purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim’s employment, and there is no Title VII violation.
"But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees’ psychological well-being, can and often will detract from employees’ job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII’s broad rule of workplace equality.” (510 US, at---, 114 S Ct, at 370-371, supra.)
Sexual harassment in the workplace has also been found to be a violation of the New York City law (Rudow v New York City Commn. on Human Rights, 123 Misc 2d 709 [Sup Ct, NY County 1984], affd 109 AD2d 1111 [1st Dept 1985]), as well as State law (Matter of Salvatore v New York State Div. of Human Rights, 118 AD2d 715 [2d Dept 1986]).
The crucial issue presented herein is whether harassment against a transsexual is included within the purview of the aforequoted statutes. In setting forth his position, plaintiff does not argue that the Federal law is applicable, but rather appears to principally rely upon the provision of the City law prohibiting discrimination based on sexual orientation.
I find that this City provision, however, does not aid plaintiff. Subdivision (20) of section 8-102 of the Administrative Code defines "sexual orientation” to mean "heterosexuality, homosexuality or bisexuality”. The term is thus dealing with sexual preferences and practices, i.e., the sex of a person’s sexual partner, with heterosexuals being persons sexually attracted to members of the opposite sex, homosexuals being those attracted to members of the same sex, and bisexuals attracted to both sexes. There is no claim that the harassment alleged herein is the result of any sexual preferences expressed by plaintiff.
*551 In Underwood v Archer Mgt. Servs. (857 F Supp 96 [D DC 1994]), the only case located in which a transsexual sought to claim coverage based on a statute prohibiting discrimination based on sexual orientation, the complaint (seeking relief based on a statute of the District of Columbia) was dismissed because it was devoid of any claim of discriminatory conduct based on the plaintiffs real or perceived preference or practice of sexuality. The court held that a "conclusory statement that [plaintiff] was discharged on the basis of transsexuality — the medical transformation from being a man to a woman — does not constitute a claim for relief on the basis of being discharged for 'sexual orientation.’ ” (Supra, at 98.)
In considering the issue of whether transsexuals are a protected class under the prohibition against discrimination based on sex, it should first be understood what is meant by transsexualism. Medically, the term is generally considered to be a condition where physiologically normal individuals experience discontent being of the sex to which they were born and have a compelling desire to live as persons of the opposite sex. The discomfort is usually accompanied by a desire to utilize hormonal, surgical and civil procedures to live the sex role opposite to which they were born. They are thus persons whose anatomic sex at birth differs from their psychological sexual identity. A transsexual is not homosexual in the true sense as the latter seek sexual gratification from members of their own sex as members of that sex, whereas transsexuals’ erotic attractions are generally with persons of their own anatomic sex, but viewing themselves as members of the opposite desired sex. Not to be confused with transsexuals are transvestites, who are persons content with their own sex and are heterosexual, but who dress as members of the opposite sex for sexual arousal (see, Note, Spelling "Relief” for Transsexuals: Employment Discrimination and the Criteria of Sex, 4 Yale L & Poly Rev 125 [1985]; Comment, The Law and Transsexualism: A Faltering Response to a Conceptual Dilemma, 7 Conn L Rev 288 [1975]; Note, Transsexuals in Limbo: The Search for a Legal Definition of Sex, 31 Md L Rev 236 [1971]).
Relevant to the issue at hand is the means by which a person’s sex is identified. Of course, at birth sex is identified by external genitalia. However, experts now generally agree that there are at least seven variables that interact to determine the ultimate sex of an individual, to wit: (1) Chromosomes (XX female, XY male); (2) Gonads (ovaries or testes); (3) *552 Hormonal secretions (androgens for males or estrogens for females); (4) Internal reproductive organs (uterus or prostate); (5) External genitalia; (6) Secondary sexual characteristics; and (7) Self-identity. (See, Note, 80 Nw U L Rev 1037 [quoting from Benjamin, The Transsexual Phenomenon, at 14 (1966) ("[E]very Adam contains elements of Eve and every Eve harbors traces of Adam, physically, as well as psychologically.”)]; Bowman and Engle, Sex Offenses: The Medical and Legal Implications of Sex Variations, 25 Law and Contemp Probs 292; Comment, The Law and Transsexualism: A Faltering Response to a Conceptual Dilemma, 7 Conn L Rev 288 [1975]; Comment, Transsexualism, Sex Reassignment Surgery and the Law, 56 Cornell L Rev 963 [1971].)
The Federal courts that have considered the issue at hand have unanimously held that the title VII prohibitions do not apply to transsexuals.
In the leading case of Ulane v Eastern Airlines (742 F2d 1081 [7th Cir 1984], cert denied 471 US 1017), a commercial airline pilot, after taking female hormones for several years as a treatment for transsexual feelings, underwent sex reassignment surgery. Thereafter, Illinois issued a revised birth certificate indicating plaintiff was a female and the Federal Aviation Authority certified plaintiff’s flight status as a female. However, the surgery did not result in plaintiff having a uterus and ovaries and her male chromosomes were unaffected. Upon being discharged by the airline, plaintiff sued claiming title VII discrimination. The District Court, finding that plaintiff was dismissed because she was a transsexual, ruled that as such plaintiff had a sexual "identity” problem and that "sex is not a cut-and-dried matter of chromosomes, and that * * * the term, 'sex’, as used in any scientific sense and as used in the statute can be and should be reasonably interpreted to include among its denotations the question of sexual identity and that, therefore, transsexuals are protected by Title VII.” (Ulane v Eastern Airlines, 581 F Supp 821 [ND Ill 1984].)
On appeal, the decision in Ulane (supra) was reversed. The Seventh Circuit, while acknowledging that title VII is a remedial statute and thus to be liberally construed, determined that it was "constrained” to rule that the term "sex” in the statute had to be given its "plain meaning [which] implies that it is unlawful to discriminate against women because they are women and against men because they are men” (742 F2d, at 1085, supra). Thus, it was concluded that while a *553 transsexual claiming discrimination because of his or her current status as a male or female could state a valid cause of action under title VII, the discrimination here was because plaintiff was a transsexual, "a biological male who takes female hormones, cross-dresses, and has surgically altered parts of her body to make it appear to be female” (supra, at 1087), and the statute does not protect persons based on their sexual identity. In so ruling, the court observed that there was little legislative history to the amendment adding the word "sex” to the statute in that it was added as a floor amendment one day before House approval of the legislation as a "gambit” of a southern congressman seeking to scuttle the 1964 Civil Rights Act, which was originally designed only to prohibit discrimination based on race (supra, at 1085).
The ruling in Ulane (supra) is consistent with the decisions of all Federal courts that have considered the issue, to wit: Dobre v National R. R. Passenger Corp. (850 F Supp 284 [ED Pa 1993]); Sommers v Budget Mktg. (667 F2d 748 [8th Cir 1982]); Powell v Read’s, Inc. (436 F Supp 369 [D Md 1977]); Grossman v Bernards Twp. Bd. of Educ. (11 FEP Cases 1196 [D NJ 1975], affd 538 F2d 319 [3d Cir 1976]); Holloway v Andersen & Co. (566 F2d 659 [9th Cir 1977]); Voyles v Davies Med. Ctr. (403 F Supp 456 [ND Cal [1975], affd 570 F2d 354 [9th Cir 1978]).
I find that the rulings in the aforesaid Federal cases are unduly restrictive and should not be followed in interpreting our New York City statute.
The only New York case on this issue is Richards v United States Tennis Assn. (93 Misc 2d 713 [Sup Ct, NY County 1977]). There Dr. Renee Richards, nee Richard Raskin, who had reassignment surgery, claimed that defendants had violated her rights under section 296 of the Executive Law in that they refused to permit her to participate in the United States Open Tennis Tournament in the women’s division. As a prerequisite to such participation, defendants had insisted that plaintiff take a test known as the Barr body test, which determines sex through an examination of chromosomes. Without extensive discussion, the court found this requirement to be discriminatory and in violation of section 296 in light of the "overwhelming medical evidence” that demonstrated that plaintiff was a female.
Although all of the aforesaid antidiscriminatory statutes were originally designed to insure equality for minorities and *554 women, they have been interpreted to also provide protection against discrimination against Caucasians and males (e.g., McDonald v Sante Fe Trail Transp. Co., 427 US 273 [1976]; CUNY-Hostos Community Coll, v State Human Rights Appeal Bd., 59 NY2d 69, 74 [1983] [purpose of statute "is to avoid discriminatory preference for any group, minority or majority”]; Harding v Gray, 9 F3d 150 [DC Cir 1993]).
Regarding decisions of Federal courts interpreting the anti-discrimination provisions of title VII, our Court of Appeals has noted that even though the State statute is similar, New York courts are not bound by interpretations of the Federal law (even by the United States Supreme Court), although the determinations are "instructive”, and that the purpose of the enactment of our State statute "was by blanket description to eliminate all forms of discrimination, those then existing as well as any later devised.” (Brooklyn Union Gas Co. v New York State Human Rights Appeal Bd., 41 NY2d 84, 86, 89 [1976]; see also, Nicolo v Citibank, 147 Misc 2d 111, 114 [Sup Ct, Monroe County 1990] ["there is nothing precluding a court of this State from making a more expansive interpretation” of our State law than that given title VII].)
In examining the City statute, it is noted that as originally enacted by Local Laws, 1965, No. 97 of the City of New York it referred to discrimination based on "sex”. However, subsequently the term "gender” was substituted for the word "sex”. While the reason for this change is not apparent, one court (Dobre v National R. R. Passenger Corp., supra), which determined that transsexuals are not covered by the word "sex” in title VII, observed that the result would be different if instead the term "gender” had been used, stating: "The term 'sex’ in Title VII refers to an individual’s distinguishing biological or anatomical characteristics, whereas the term 'gender’ refers to an individual’s sexual identity. Holloway, 566 F.2d at 662-63.” (850 F Supp, at 286, supra.)
In most of the Federal cases, the courts in denying protection to transsexuals have partially relied on the fact that many bills had been offered subsequent to 1965 to add the term "sexual orientation” to title VII, but none had been passed (e.g., Ulane v Eastern Airlines, 742 F2d, at 1086, supra ["their rejection strongly indicates that the phrase in the Civil Rights Act prohibiting discrimination on the basis of sex should be given a narrow, traditional interpretation, which would also exclude transsexuals”]; Holloway v Andersen & Co., 566 F2d, at 662, supra [failure to add sexual orientation shows *555 "that Congress had only the traditional notions of 'sex’ in mind”]; Sommers v Budget Mktg., 667 F2d, at 750, supra ["the fact that the proposals were defeated indicates that the word 'sex’ in Title VII is to be given its traditional definition, rather than an expansive interpretation”]; Powell v Read’s, Inc., supra; Voyles v Davis Med. Ctr., supra).
However, I find this argument unpersuasive. As indicated above, there is a clear distinction between homosexuals and transsexuals. Because Congress may have chosen not to include the term "sexual orientation” in title VII does not mean that it has considered and declined coverage to transsexuals.*
However, if it is logical to assume that the failure of Congress to adopt legislation to include the term "sexual orientation” in title VII is proof of lack of intent to include transsexuals, it would seem that courts that adopted this position would have to agree as a corollary that the inclusion of such term in a statute would evidence an intent to include transsexuals. Thus, it could be argued that the 1991 amendment to the New York City statute adding "sexual orientation” to section 8-107 as a prohibited ground on which to discriminate would mean that transsexuals are now covered. But, since I disagree with basic contentions that the failure of Congress to include the term "sexual orientation” in title VII demonstrates an intent to exclude transsexuals, I do not rely on the aforesaid corollary to support my conclusion that transsexuals are protected against discrimination under the provisions of the Administrative Code. (Cf., Underwood v Archer Mgt. Servs., supra.)
As all courts agree, the antidiscrimination statutes are remedial and thus to be interpreted liberally to achieve their intended purposes. Our New York City law is intended to bar all forms of discrimination in the workplace and to be broadly applied. Accordingly, I find that the creation of a hostile work *556 environment as a result of derogatory comments relating to the fact that as a result of an operation an employee changed his or her sexual status creates discrimination based on "sex”, just as would comments based on the secondary sexual characteristics of a person. For example, an employer who continually made derogatory comments regarding an employee’s breasts could clearly be found to be in violation of the law’s provisions against sexual harassment (e.g., Zveiter v Brazilian Natl. Superintendency of Merchant Mar., 833 F Supp 1089 [SD NY 1993]). Thus, an employer who harasses an employee because the person, as a result of surgery and hormone treatments, is now of a different sex has violated our City prohibition against discrimination based on sex. In other words, an employee who has fulfilled a sexual identity urge by changing sex and is harassed because of such fulfillment is entitled to the law’s protection against employer harassment.
Although, as indicated above, a person may have both male and female characteristics, society only recognizes two sexes. In the complaint plaintiff alleges that he is now a male based on his identity and outward anatomy. Being a transsexual male he may be considered part of a subgroup of men. There is no reason to permit discrimination against that subgroup under the broad antidiscrimination law of our City.
Accordingly, defendant’s motion to dismiss the complaint is denied.

 It is noted that the Supreme Court has not as yet ruled as to whether same sex harassment is covered under the term "sex” in title VII, and that currently there is a split of authority on the issue (see, Joyner v AAA Cooper Transp., 597 F Supp 537 [MD Ala 1983], affd 749 F2d 732 [11th Cir 1984]; Wright v Methodist Youth Servs., 511 F Supp 307 [ND Ill 1981]; Garcia v Elf Atochem N. Am., 28 F3d 446 [5th Cir 1994]; Hopkins v Baltimore Gas & Elec. Co., 871 F Supp 822 [D Md]). However, based on the language of the Supreme Court in Meritor Sav. Bank v Vinson (477 US, at 64, supra ["when a supervisor sexually harasses a subordinate because of the subordinate’s sex, that supervisor 'discriminates’ on the basis of sex”]), I believe that should the issue reach the Supreme Court, same sex harassment will be deemed covered under title VII.