■ HISPANIC AIDS FORUM, Respondent, v ESTATE OF JOSEPH BRUNO, Deceased, et al., Appellants. [792 NYS2d 43]—

Order, Supreme Court, New York County (Marilyn Shafer, J.), entered October 10, 2003, which, to the extent appealed from, denied defendants' motion, pursuant to CPLR 3211 (a) (7), to dismiss plaintiff's first and second causes of action alleging sex and gender discrimination, reversed, on the law, without costs, and the motion granted, with leave to replead should plaintiff be so advised.

While it is true that in considering a motion to dismiss brought pursuant to CPLR 3211 (a) (7), the court must presume the facts pleaded to be true and must accord them every favorable inference (*Cron v Hargro Fabrics*, 91 NY2d 362, 366 [1998]; *Rabouin v Metropolitan Life Ins. Co.*, 307 AD2d 843, 844 [2003]), it is also axiomatic that factual allegations that consist of bare legal conclusions are not entitled to such consideration (*Skillgames, LLC v Brody*, 1 AD3d 247, 250 [2003]; *Caniglia v Chicago Tribune-New York News Syndicate, Inc.*, 204 AD2d 233 [1994]).

Plaintiff Hispanic AIDS Forum is, according to the complaint, an organization that offers prevention and education programs that foster an increased awareness and knowledge of HIV/AIDS in Latino communities and addresses attitudes, beliefs and behaviors that place Latinos at risk. Defendant Estate of Joseph Bruno, and defendant Trustees of the Estate, own and operate the building designated as 74-09 37th Avenue, Jackson Heights, Queens. Plaintiff, beginning in 1991, maintained its offices in the building pursuant to various lease agreements. By 1995, plaintiff needed additional space, which resulted in the execution of two separate lease agreements, effective through April 2000, for two suites on the third floor of the building. Plaintiff was required to share the common areas, such as the restrooms, with the other commercial tenants on the third floor.

Plaintiff alleged that in April 2000, the parties successfully negotiated a five-year renewal lease, which was to take effect on May 1, 2000. In the interim, during the first few months of 2000, plaintiff noted that its transgender population increased because it had formed a support group for the transgender population. Plaintiff claimed that it executed the renewal lease, but was subsequently informed by defendants' office manager that the lease would not be renewed due to various complaints regarding the use of the bathrooms by its transgender clientele.

Plaintiff's remaining two causes of action[1] seek redress under the New York State and New York City Human Rights Law. The

---

**1.** Plaintiff's third and fourth causes of action, asserting discrimination based on disability under the New York State Human Rights Law and the

New York State Human Rights Law, in effect at the relevant time, provided, in pertinent part, that: "It shall be an unlawful discriminatory practice . . . [t]o refuse to sell, rent, lease or otherwise deny to or withhold from any person . . . land or commercial space because of the race, creed, color, national origin, sex, age, disability, marital status, or familial status of such person or persons . . ." (Executive Law § 296 [5] [b] [former (1)]).

The New York City Human Rights Law, in force at the time of the allegations set forth herein, provided, inter alia, that: "It shall be an unlawful discriminatory practice . . . [t]o refuse to sell, rent, lease . . . or otherwise deny or to withhold from any person or group of persons land or commercial space . . . because of the actual or perceived race, creed, color, national origin, gender, age, disability, sexual orientation, marital status or alienage or citizenship status . . ." (Administrative Code of City of NY § 8-107 [5] [b] [1]).

The New York City was subsequently amended in 2002 to provide specifically that the term "gender" includes "a person's gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to that person at birth" (Administrative Code § 8-102 [23]). The State Legislature declined to adopt a similar amendment which would have specifically included transgender individuals under the State 's protective umbrella.

The parties herein, as well as the amici, extensively address the issues of whether the City and State Human Rights Laws in effect at the time were applicable to transgender individuals, as well as the significance of the City's amendment of its Code, and the State's refusal to adopt such an amendment.[2] We, however, at this juncture, decline to address those issues, for

New York City Administrative Code, respectively, were dismissed without prejudice.

2. We note that the dissent, in discussing preamendment discrimination decisions applying antidiscrimination protection to transsexuals (see *Richards v United States Tennis Assn.*, 93 Misc 2d 713 [1977]; *Maffei v Kolaeton Indus.*, 164 Misc 2d 547 [1995]; *Rentos v Oce-Office Sys.*, 1996 WL 737215, 1996 US Dist LEXIS 19060 [SD NY, Dec. 24, 1996]), states that these decisions were not called into question, "but in fact were accepted as prevailing law by the Court of Appeals in *McGrath v Toys 'R' Us*" (3 NY3d 421 [2004]), adding that we cannot now ignore them. While we are aware that it would be unwise to ignore any precedent, those cases are certainly not controlling. Moreover, the Court in *McGrath*, in addressing the significance of those cases, opined that "the fact a handful of lower courts had interpreted the statute broadly did not put to rest the scope of coverage issue" (at 436).

the complaint, as it stands, fails to state a cause of action regardless of the applicability of the statutes to transgender individuals.

The allegations set forth in the complaint assert, despite plaintiff's attempt to paint them with a broader brush, that defendants refused to execute the lease renewal because plaintiff's transgender clients were using the common area restrooms that did not coincide with their biological sex and that the other tenants in the building were complaining. Specifically, the complaint attributes the following statements to specific individuals: Lucy Delgado, an employee of a travel agent that shared space on the third floor of the building with plaintiff, explained that two of the travel agent's employees did not like " 'those men that look like women using the [women's] bathroom' "; Dorothy Novotny, the landlord's office manager, purportedly told plaintiff's representative that "other tenants were complaining because 'men who think they're women are using the women's bathroom' "; Novotny later explained to a different representative of plaintiff that the landlord had received complaints from other tenants, and had issues with " 'men who think they are women using the women's bathrooms' "; and Jeff Henry, the landlord's property manager, who "complained" to Leon Quintero, plaintiff's attorney, that " 'men dressed as women [were] coming into the building and using the bathrooms,' " after which Henry stated " '[t]hey can't use the wrong restrooms.' "

The complaint, in one sentence of its three-paragraph "Introduction," makes the claim that plaintiff was "told . . . the lease would not be renewed unless [plaintiff] prevented its transgender clients from using common areas in the building, including the main entrance and bathrooms." The ultimatum is attributed to "they," or further back in the sentence to defendants, but nowhere in the complaint is a specific individual, i.e., any of the Trustees, or their agents, credited with making that particular threat. Indeed, at one point, Quintero is alleged to have informed Henry that plaintiff "could not legally restrict its transgender clients' use of the building entrance, hallways or bathrooms," yet the complaint is devoid of any allegation that Henry, or anyone else other than "they," made such a threat.

Contrary to the dissent's unfortunate characterization of our ruling as "puzzling," in that we are charged with "artfully eliminat[ing]" the complaint's central allegation by "misstat-[ing]" what the complaint alleges, it is the dissent which endeavors to expand the scope of the complaint well beyond the

allegations set forth therein. The dissent emphasizes that the defendants would only renew the lease "if plaintiff agreed, *in writing*, to preclude *all* of its transgender clients from using *any* of the building's public restrooms . . . and [even] the building's main entrance." Yet, a careful review of the complaint reveals no such allegation; in fact, the only instance in which a written agreement is mentioned, and which is apparently the springboard for the dissent's conclusions, purportedly occurred in the following conversation between Quintero and Henry as conveyed in paragraph 23 of the complaint: "Quintero and Henry had several conversations in which Henry insisted that [plaintiff] *agree in writing that its clients would no longer use the public bathrooms in the building*. Henry told Quintero that the Landlord needed such an agreement because other tenants were complaining about 'the type of clientele' coming in and out of the building and using the bathrooms. *Specifically*, Henry complained about 'men dressed as women coming into the building and using the bathrooms.' *When Quintero asked whether Henry was referring to transgendered clients, Henry responded 'I don't care what they are. They can't use the wrong restrooms'* " (emphasis added). No reference in the complaint regarding the use of the building's entrances is attributed to any identified individual, and it certainly was never associated with a request for a written agreement.

In sum, the complaint, as it stands, alleges not that the transgender individuals were selectively excluded from the bathrooms, which might trigger one or both of the Human Rights Laws, but that they were excluded on the same basis as all biological males and/or females are excluded from certain bathrooms—their biological sexual assignment. In this vein, we find the Minnesota Supreme Court's decision in *Goins v West Group* (635 NW2d 717 [Minn 2001]) to be instructive. In *Goins*, plaintiff claimed that defendant discriminated against her[3] based upon her sexual orientation by designating restrooms and restroom use on the basis of biological gender, in violation of the Minnesota Human Rights Act ([MHRA] Minn Stat § 363.03 [1] [2] [2000] [now Minn Stat § 363A.08 (2) (c)]). The MHRA was clearly written to encompass transgender individuals, and provides that the definition of "sexual orientation" includes "having or being perceived as having a self-image or identity not traditionally associated with one's biological maleness or femaleness" (635 NW2d at 722). Nevertheless, the court concluded that the defendants' designation of restroom use, applied uniformly, on the basis of "biological gender," rather than

---

**3.** Biologically, Goins was a male.

biological self-image, was not discrimination. We agree with this rationale and, rather than issue an "advisory opinion," as the dissent opines, we reverse and dismiss the complaint, on the merits, as, at this juncture, the only discernible claim set forth in the complaint is that plaintiff's transgender clients were prohibited from using the restrooms not in conformance with their biological sex, as were all tenants. Inasmuch as plaintiff makes vague allusions to a connection between defendants' refusal to renew the lease and plaintiff's refusal to prohibit its transgender clients from using the building's common areas, including the main entrance, we grant leave to replead if plaintiff chooses to pursue those assertions with an adequate degree of specificity. Concur—Marlow, Sullivan, Nardelli and Catterson, JJ.

Saxe, J.P., dissents in a memorandum as follows: A very simple and direct pleading issue is presented on this appeal: Does it constitute sex discrimination under the New York State Human Rights Law (Executive Law § 296 [5] [b] [1]) or gender discrimination under the New York City Human Rights Law (Administrative Code of City of NY § 8-107 [5] [b] [1]) when a landlord refuses to renew the lease of a tenant who provides services for transgender clients, unless the tenant prevents those transgender clients from using the building's restrooms and common areas?

While acknowledging that such an allegation "might trigger one or both of the Human Rights Laws," the majority nevertheless dismisses plaintiff's causes of action for sex and gender discrimination. This puzzling ruling, in effect, amounts to the preemptive issuance of an advisory opinion on a question not yet before the Court, a question which might not necessarily be presented at all in this litigation. To accomplish this, the majority artfully eliminates the complaint's central allegation, and instead focuses solely on those factual allegations that provide background information. Having misstated what the complaint alleges, the majority then concludes, as a matter of law, that the allegations (as misstated) do not demonstrate discrimination. Finally, it issues an invitation to replead, which would presumably permit plaintiff to allege again that which it has already alleged: that defendants violated the Human Rights Laws by denying plaintiff a renewal lease unless it agreed to prevent its transgender clients from using the building's restrooms and common areas. This elaborate procedure allows the majority to issue a premature ruling on an issue not presented for decision at this time: whether it constitutes discrimination when a transgender individual is prevented from using the restroom corresponding with his or her adopted gender.

## BACKGROUND

Plaintiff Hispanic AIDS Forum is a Latino-run nonprofit organization which seeks to reduce HIV transmission by providing treatment and education services. Beginning in 1991, the organization has maintained one of its offices at 74-09 37th Avenue in Jackson Heights, a building owned and operated by defendants. It is alleged that following successful negotiations for a five-year renewal lease to take effect May 1, 2000, and after plaintiff executed the lease, defendants' office manager, Dorothy Novotny, informed plaintiff that defendants would not renew the lease, due to complaints from the other building tenants regarding the use of the building's restrooms by plaintiff's transgender clients, referred to by other tenants as "men who think they're women."

The complaint further alleges that Jeff Henry, defendants' property manager, thereafter advised Leon Quintero, plaintiff's attorney, that defendants would not renew the lease *unless plaintiff agreed that its transgender clients would not use the building's public restrooms*. Moreover, during subsequent negotiations, Henry allegedly insisted, on account of the complaints from the other tenants, that plaintiff agree in writing that its transgender clients would no longer use the public restrooms in the building. Furthermore, the introductory section of the complaint also alleges that defendants would not renew the lease unless plaintiff also prevented its transgender clients from using the building's main entrance. In addition, it is alleged, Henry informed Quintero that he just needed to get rid of "all these queens."

Plaintiff received an eviction notice on June 30, 2000. Defendants then commenced an eviction proceeding in Housing Court, and plaintiff stipulated to vacate the premises without prejudice to these claims. Plaintiff then commenced this action, asserting that defendants unlawfully discriminated by refusing to lease the space to plaintiff because of its transgender clients. The first cause of action alleges sex discrimination under the New York State Human Rights Law, and the second alleges gender discrimination under the New York City Administrative Code.[1]

Although the complaint does not define the term transgender, medical texts and legal decisions describe the condition as one

---

1. Plaintiff's third and fourth causes of action were dismissed without prejudice, and have since been repleaded. While plaintiff's brief discusses these disability claims, they are not part of the record on appeal, their merits have not yet been addressed by the IAS court, and they cannot be ruled on here.

in which an individual identifies psychologically as belonging to the opposite gender. "Transgender people are those who have a strong and persistent cross-gender identification and experience persistent discomfort about their assigned sex" (Diagnostic and Statistical Manual of Mental Disorders, at 532-533 [4th ed 1994] [DSM-IV]). The term applies whether or not these individuals undergo complete gender reassignment surgery, hormone therapy and treatment to alter their secondary sex characteristics, or simply present themselves, in dress, appearance and behavior, as belonging to the gender with which they identify (*id.*).

While most of the related legal decisions by the courts of this state employ the word "transsexual," which term is often used to refer to those who have undergone full gender reassignment surgery, in the recent case of *McGrath v Toys "R" Us* (3 NY3d 421 [2004]) the plaintiffs identified themselves as "preoperative transsexuals" (at 426). Other cases refer to persons diagnosed with "gender identity disorder" (*see Matter of Doe v Bell,* 194 Misc 2d 774, 775 [2003]). In general, plaintiff's usage is adopted here.

## DISCUSSION

The basis for the claims of discrimination here is not merely that defendants sought to prevent people from using any bathroom other than that corresponding with their biological gender; it is that defendants discriminated by *refusing to renew the lease* unless plaintiff would exclude its transgender clients from the building's public restrooms and main entrance.

While the complaint sets forth that the difficulties initially arose when others in the building complained about biological males using the women's bathroom, it goes on to assert that when the time came to renew the lease, defendants would only do so if plaintiff agreed, *in writing,* to preclude *all* of its transgender clients from using *any* of the building's public restrooms; elsewhere it alleges, without attribution to a particular individual, that defendants also asked that plaintiff's clients even be precluded from using the building's main entrance.

On a motion to dismiss pursuant to CPLR 3211, the only issue is whether the allegations manifest any cause of action, giving the plaintiff the benefit of every possible favorable inference (*Guggenheimer v Ginzburg,* 43 NY2d 268, 275 [1977]), and we must accept the allegations as true (*see Leon v Martinez,* 84 NY2d 83, 87-88 [1994]). There is no basis in the CPLR to exclude from consideration factual allegations contained in the complaint's introductory paragraphs, or alleged statements not

attributed to a particular individual, whose source may be clarified in the context of a bill of particulars or during discovery. Nor may the court eliminate from consideration alleged statements that it deems to have been "clarified" or in effect retracted by an alleged subsequent statement. The only question here is whether the allegations, including the assertion that the landlord refused to renew plaintiff's lease unless it prevented its clients from using building restrooms and the main entrance, may be said to constitute a violation of the New York State Human Rights Law (Executive Law § 296 [5] [b] [1]) and the New York City Human Rights Law (Administrative Code § 8-107 [5] [b] [1]).

The majority recognizes that the complaint includes an allegation that Jeff Henry, defendant's property manager, sought a written agreement that plaintiff would prohibit its clients from using all the restrooms; however, it then proceeds with its analysis as if another alleged statement by Mr. Henry ("I don't care what they are. They can't use the wrong restrooms") completely nullifies his other statement. This amounts to an act of factual interpretation inappropriate in the context of a CPLR 3211 motion. Moreover, as to the majority's suggestion that the complaint is insufficient in not attributing alleged statements to a particular individual, any such lack is not fatal, but may be clarified in the context of a bill of particulars.

In holding that its allegations fail to set forth a cause of action, the majority quotes from the portion of the complaint that sets forth these allegations, including the assertion that "[Jeff] Henry insisted that [plaintiff] agree in writing that its clients would no longer use the public bathrooms in the building." Yet, it remarks that "a careful review of the complaint reveals no such allegation." Clearly, the quoted portion of the complaint includes a factual assertion that suffices to assert a cause of action for discrimination.

Executive Law § 296 (5) (b) (1), New York State's Human Rights Law, as effective at the time of the alleged discrimination, provided: "It shall be an unlawful discriminatory practice . . . [t]o refuse to sell, rent, lease or otherwise deny to or withhold from any person or group of persons land or commercial space because of the race, creed, color, national origin, sex, age, [or] disability . . . of such person or persons . . . ." New York City Administrative Code § 8-107 (5) (b) (1) contained parallel language, except for the inclusion of the phrase "actual or perceived" and the use of the term "gender" instead of the word "sex."

Because these antidiscrimination statues are remedial, they

must be interpreted liberally to achieve their intended purpose (*see Matter of New York County DES Litig.*, 89 NY2d 506, 514 [1997], citing *Rothstein v Tennessee Gas Pipeline Co.*, 87 NY2d 90, 96 [1995], and McKinney's Cons Laws of NY, Book 1, Statutes § 96, at 209). Indeed, a broad interpretation is particularly appropriate since "the very purpose of the [Human Rights Law] was . . . to eliminate all forms of discrimination, those then existing as well as any later devised" (*Brooklyn Union Gas Co. v New York State Human Rights Appeal Bd.*, 41 NY2d 84, 89 [1976]).

Protected Class

In any discrimination claim, the first thing the plaintiff must establish is that the plaintiff is a member of a group that the statute intends to protect.[2] It is defendants' position that transgender individuals were not protected by the City and State Human Rights Laws as they existed at the time of the alleged discrimination. Defendants particularly note that the City Human Rights Law was only subsequently amended (in 2002) to specifically include protection of transgender individuals, and furthermore, that the State Legislature recently rejected a proposal to enact such a modification to the State Human Rights Law. However, even as they stood at the time this action was commenced, these laws protected transgender individuals from discrimination.

New York State Executive Law

As to the New York State Human Rights Law, "[t]he standards for establishing unlawful discrimination under section 296 of the Human Rights Law are the same as those governing title VII cases under the Federal Civil Rights Act of 1964 [42 USC § 2000e *et seq.*]" (*Rainer N. Mittl, Ophthalmologist, P.C. v New York State Div. of Human Rights*, 100 NY2d 326, 330 [2003], citing *Ferrante v American Lung Assn.*, 90 NY2d 623, 629 [1997]). Because title VII and the New York State Human Rights Law have many similarities, federal case law has been looked to in analyzing questions under state law (*see Matter of Aurecchione v New York State Div. of Human Rights*, 98 NY2d 21, 26 [2002]).

Defendant takes the position that the term sex discrimination

---

**2.** Plaintiff organization is a proper plaintiff to claim discrimination although the focus of the discriminatory intent is plaintiff's clients. It is established that these Human Rights Laws prohibit associational discrimination, that is, discrimination based upon the protected characteristics of the tenant's clients or customers (*see e.g. Bernstein v 1995 Assoc.*, 185 AD2d 160, 163 [1992]; *Matter of Barton v New York City Commn. on Human Rights*, 151 AD2d 258 [1989]).

only applies to actions or decisions taken because of the victim's gender, or what the perpetrator perceived the victim's gender to be, and not actions taken based upon the victim's adoption of the other gender's trappings. However, *Price Waterhouse v Hopkins* (490 US 228 [1989]) established that sex discrimination may occur based upon actions taken because of the victim's failure to conform with sex stereotypes, rather than because of his or her gender per se. The victim in *Hopkins* was a senior manager whom the firm's policy board refused to repropose for partnership, *not* because she was a woman, but because although she was a woman her behavior failed to conform to female sex stereotypes: she did not walk "femininely," wear makeup, style her hair or wear jewelry (*id.* at 235). As the Court explained, "[i]n the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, *has acted on the basis of gender*" (*id.* at 250 [emphasis added]).

By the same token, an anatomical male who puts on what he believes to be the trappings of femininity, and is treated differently for doing so, is experiencing sex discrimination, under title VII and no less under the Executive Law. Even though the treatment is not because of his gender per se, it is sex discrimination when it occurs because the victim is behaving in a manner contrary to defendants' sex-stereotyped expectations of how a man ought to behave.

That the Legislature declined to amend the Executive Law so as to specifically include transgender people in its list of protected classes cannot be taken to necessarily mean that the Legislature intended that they be excluded from its coverage. Given the existence of prior case law under the statutes applicable here, applying antidiscrimination protections to transsexuals (*see Richards v United States Tennis Assn.*, 93 Misc 2d 713 [1977]; *Maffei v Kolaeton Indus.*, 164 Misc 2d 547 [1995]; *Rentos v Oce-Office Sys.*, 1996 WL 737215, 1996 US Dist LEXIS 19060 [SD NY, Dec. 24, 1996]), the decision not to include "transgender" in the statute's list is not dispositive. Indeed, it is arguably more meaningful that the Legislature did not specifically exclude the transgendered from the statute's application, as Congress did in the Americans with Disabilities Act (*see* 42 USC § 12211 [b] [1]) and the Rehabilitation Act (*see* 29 USC § 705 [20] [F] [i]). The decision not to affirmatively add transgender individuals to the list of those covered by the statute's protection is quite different from affirmatively repealing or revising the protection already indicated by prior cases.

Furthermore, since those earlier discrimination decisions were

not called into question, but in fact were accepted as prevailing law by the Court of Appeals in *McGrath v Toys "R" Us* (*supra*), we cannot now ignore them.

Nor does the analysis change because in those earlier cases the plaintiffs may have physically altered their secondary sex characteristics to some extent.[3] The concept of discrimination does not apply in different ways to those who have completed the gender reassignment process and those who have not begun it, and there is no case holding otherwise. The prohibition against sex discrimination applies to transgender individuals regardless of where the particular victim falls on the gender-reassignment spectrum.

New York City Administrative Code

Similarly, plaintiff's transgender clients are covered under the New York City Human Rights Law even as it existed at the relevant time. It is true that the subsequent 2002 amendment clarified the intended scope of the term "gender" in the City's antidiscrimination law so as to leave no doubt that transgender people are covered (Administrative Code § 8-102 [23] [eff Apr. 30, 2002][4]). But this modification was specifically referred to by the City Council as a clarification rather than an expansion (*see* Local Law No. 3 [2002] of City of New York § 1 ["The scope of this gender-based protection, however, requires clarification" ("Legislative findings and intent")]). Indeed, the Court of Appeals, in *McGrath v Toys "R" Us*, remarked in regard to the adoption of the 2002 amendment that "the City Council determined that, in its view, the Code already protected transsexuals but was concerned that, without the amendment, the law could be misinterpreted as excluding this class of individuals from coverage" (3 NY3d at 435).

The issue for the Court of Appeals in *McGrath* was whether the underlying action had in some way "served a significant public purpose" so as to entitle plaintiffs' attorney to an award of attorney's fees under the City Human Rights Law although

---

**3.** In *Richards*, the plaintiff tennis player had undergone gender reassignment surgery (93 Misc 2d at 721-722). In *Rentos*, the plaintiff had "started, but had not completed, the process of changing her sex from male to female at the time of her hiring" (1996 WL 737215, at *1, 1996 US Dist LEXIS 19060, at *2). In *Maffei*, the record was said to be unclear as to "what extent the plaintiff completed his metamorphosis from a female to a male" (164 Misc 2d at 548).

**4.** The 2002 amendment specifies that the term "gender" includes "actual or perceived sex and shall also include a person's gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to that person at birth."

the plaintiffs, who had prevailed on the merits at trial, had been awarded only nominal damages (*id.* at 426). The Court approved the award of attorney's fees, explaining that while prior cases had already held that transsexuals were covered by the City Human Rights Law (*id.* at 435, citing *Maffei v Kolaeton Indus., supra,* and *Matter of Arroyo v New York City Health & Hosps. Corp.*, 1994 WL 932424 [NY City Commn on Human Rights 1994]), and the new legislation had merely "eras[ed] any doubt" on the subject (*id.*), nevertheless this "was the first public accommodation case that went to verdict under the New York City Human Rights Law, and was the first judgment in favor of transsexuals" (*id.* at 436). The Court characterized the underlying verdict as "a groundbreaking verdict [that] can educate the public concerning substantive rights and increase awareness as to the plight of a disadvantaged class" (*id.*). Importantly, even the dissenting Judge, who believed the award of attorney's fees was improper under the applicable standard, arrived at her conclusion because the law was already established under pre-2002 law: "the purportedly groundbreaking legal principle—the recognition of transsexuals as members of a protected class safeguarded against discrimination by the New York City Human Rights Law—had already been supported by the only courts to have considered the question" (*id.* at 437-438 [Read, J., dissenting], citing *Maffei, supra* and *Rentos v Oce-Office Sys., supra*).

It is only possible to assert that the pre-2002 form of the New York City Human Rights Law did not cover transsexuals (pre or postoperative) if we ignore all the foregoing cases.

Discriminatory Conduct

Once it is established that a plaintiff is a member of the class protected by the antidiscrimination statute at issue, there remains the matter of whether the complained-of conduct may be found to constitute discrimination on that basis. Here, the question is whether it is discrimination on the basis of gender or sex to deny a tenant a renewal lease unless the tenant prevents its transgender clients from using *any of* the restrooms. While defendant repeatedly contends that it is not discriminatory to prevent individuals who are anatomically male from using the women's restroom (and vice versa), that is not the issue presented here.

For purposes of this CPLR 3211 motion, the claim that issuance of a renewal lease was conditioned on the exclusion of plaintiff's transgender clients from public portions of the building, and in particular the bathrooms—all the bathrooms—asserts enough to state a claim under the City and State Human

Rights Laws. The question of what actually occurred and whether it amounted to discrimination must await the development of a factual record.

Similarly, because this CPLR 3211 motion does not involve any factual determination, it would be premature to adopt the reasoning suggested by defendants, that they had a proper, nondiscriminatory business purpose in denying plaintiff a renewal lease, because plaintiff's clients persisted in flouting clear, reasonable building rules about using the bathrooms.

I recognize that plaintiff and its clients, as well as the organizations submitting amicus curiae briefs, seek to press the point that antidiscrimination laws require that sex-segregated restrooms permit access to not only those of that biological gender, but to those who psychologically identify as belonging to that gender. On the other side of that coin, defendants raise the spectre of female-identified biological males insisting on using the women's locker rooms at sports clubs and gyms.

These issues of gender identity and its ramifications in the context of the Human Rights Law must and will be addressed by the courts. However, as tempting as it may be to weigh in on that issue now, it is, if not entirely irrelevant to the issues before us, certainly premature. Should it be established that defendants were merely seeking to limit people to the restroom matching their anatomical or biological gender, it would then be appropriate to address the issue of what restrictions or limitations, if any, may properly be imposed on transgender individuals. But, if it is demonstrated that defendants proposed as a condition of renewing the lease that these transgender individuals be prohibited from using any building restrooms, there may be no basis to consider whether reasonable restrictions are proper.

In view of the foregoing, defendants' application to dismiss the first and second causes of action was properly denied.