816 A.2d 68

In the Matter of Robert Wright HEILIG

\* \* \* \* \*

Janet Heilig Wright.

No. 38, Sept.Term, 2002.

Court of Appeals of Maryland.

Feb. 11, 2003.

Alyson Dodi Meiselman (Phyllis Randolph Frye, on brief), North Potomac, for petitioner.

No argument for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

WILNER, Judge.

Petitioner was born in Pennsylvania in 1948. His birth certificate, issued by the Department of Health of that State, records his name as Robert Wright Heilig and his sex as male.

In March, 2001, Mr. Heilig filed a petition in the Circuit Court for Montgomery County, in which he alleged that he was then a Maryland resident and that he was "transitioning from male to female." Invoking the equitable jurisdiction of the court, he asked for an order that would change his name to Janet Heilig Wright and change his "sexual identity" designation from male to female. He noted in his petition the existence of Maryland Code, § 4–214(b)(5) of the Health–General Article, which directs the Secretary of Health and Mental Hygiene, upon receipt of a court order indicating that the sex of an individual born in Maryland "has been changed by surgical procedure," to amend that person's Maryland birth certificate accordingly, but he did not ask the court to order the alteration or amendment of his Pennsylvania birth certificate or, indeed, of any other document.

No answer or opposition of any kind was filed to the petition. Nonetheless, although ultimately entering an order that changed petitioner's name, the court refused to enter an order changing his sexual identity, concluding that (1) gender had physical manifestations that were not subject to modification, and (2) there was no authority for the court to enter such an order. The effect of the order was to give petitioner a woman's name but to retain his official gender as male. Petitioner did not contest the change in name but appealed the part of the judgment denying his request for recognition of his change in gender.

The Court of Special Appeals affirmed that decision, on at least three alternate grounds. First, although the petition was certainly not filed as such, the court treated the request for change of gender (although not the request for change of name) as necessarily being in the nature of an action for declaratory judgment. The court concluded, however, that, as no one contested the relief sought or challenged petitioner's claim or status, there was no immediate case or controversy and therefore no justiciable claim and, accordingly, no "jurisdiction" to enter declaratory relief. The court suggested that, if petitioner ever desired to marry a man and was denied a marriage license because of his gender, such a controversy might exist, but observed that none existed currently. Second, the intermediate appellate court held that, even if a justiciable claim had been presented, there was no statutory or common law basis for the kind of general gender-change order sought by petitioner. Section 4–214(b)(5) was inapplicable, as petitioner had not been born in Maryland, and the court could find no other authority for a court to change the designation of a person's sex or gender.

Though acknowledging that Maryland courts have equity jurisdiction to fashion remedies in the absence of an authorizing statute, the Court of Special Appeals concluded that such jurisdiction must be based on traditional, fundamental principles of the common law, and not on the broad concept of fairness alone. It rejected the notion that equitable jurisdiction in this case could be based on the principle that "equity

will not suffer a wrong to be without a remedy." The petitioner, the court said, had not yet suffered a wrong.

Finally, the appellate court concluded that, even if the Circuit Court had equitable jurisdiction to grant the relief requested, such relief could not be granted to the petitioner because he had not shown that any purported change in his sexual status was in fact permanent. In default of such evidence, the court stated, the petitioner "has not established a strong case on the equities."

We granted *certiorari* to consider whether a Maryland Circuit Court has jurisdiction to grant the kind of relief sought by petitioner, and, if so, whether, on the record in this case, petitioner has established a right to that relief. We shall conclude that (1) jurisdiction *does* exist to determine and declare that a person has changed from one gender to another, (2) petitioner did not establish that he had sufficiently effected that change to be entitled to such a determination and declaration, but, (3) in the interest of justice, he should be permitted to offer further proof in this regard. We shall therefore direct that the case be remanded to the Circuit Court for further proceedings.

## BACKGROUND

Perhaps because there was no opposition to the petition, the factual evidence in support of petitioner's request for a legal determination of gender change was rather skimpy. Attached to the petition was a copy of petitioner's birth certificate and two letters, each addressed "To Whom It May Concern." The first, from Dr. Michael Dempsey, an endocrinologist, stated that petitioner had been under his care for eighteen months as a "transgendered person," that her treatment consisted of female hormones and anti-androgens "designed to maintain her body chemistry and bring about anatomical changes within typical female norms," that the hormonal therapy had resulted in "hormonal castration," and that, in Dr. Dempsey's medical opinion, the gender designation on petitioner's driver's license and other documents should be changed to female to "accu-

rately reflect both her appearance and the hormonal changes of her body."[1] The second letter, from a licensed social worker named Ellen Warren, stated that petitioner "is in psychotherapeutic treatment . . . as a transsexual woman," that it was Ms. Warren's professional opinion that petitioner's name and gender should be legally changed to reflect "her true gender identity, which is female," and that such change was "in accordance with the Standards of Care of the Harry Benjamin International Gender Dysphoria Association."

A court master, completely misconstruing the nature of the requested relief, placed in the court file and presumably sent to petitioner a document asking what authority a Maryland court had "over the Secretary of State for Pennsylvania" and for petitioner to "indicate how petition complies with Health–Gen Article § 4–214(b)(5)." Petitioner responded with a memorandum urging that, although the court had no authority over officials from other States, it did have equity jurisdiction to entertain petitions for change of name and gender filed by Maryland residents. Petitioner acknowledged that, because he was not born in Maryland and did not have a Maryland birth certificate, he was unable to take direct advantage of § 4–214(b)(5), but contended that, under equal protection principles, he was entitled to a determination from a court of competent jurisdiction that his gender had changed.

The hearing conducted by the Circuit Court dealt entirely with the issue of jurisdiction. No inquiry was made as to whether petitioner had undergone any sex reassignment surgery, whether and to what extent the hormonal therapy noted by Dr. Dempsey was permanent and irreversible, or what, if

---

1. The letter from Dr. Dempsey used the feminine pronoun in describing petitioner. Because of our conclusion that petitioner has not yet established an entitlement to a determination that his gender has been effectively changed from male to female, we shall use the masculine pronoun. We do so not to disparage petitioner's undoubtedly sincere belief that his transition is, indeed, complete, but simply to be consistent with our conclusion that he has yet to offer sufficient evidence to warrant that determination as a legal matter. We note that, in the petition and other papers filed with the Circuit Court, petitioner also used the masculine pronoun to describe himself.

any, criteria had been generally accepted in the medical or legal community for determining when, if ever, a complete, permanent, and irreversible gender change has occurred. Although it seems clear from our research that this issue has been considered by courts and legislatures in other States and countries and by various non-judicial agencies, no evidence of the type just noted was presented to the Circuit Court. The only evidence presented in support of the petition, apart from the two letters attached to it, was a form letter from the Maryland Motor Vehicle Administration establishing that, upon review and recommendation by its Medical Advisory Board, the Administration does recognize "transitional gender status change" and will issue a new driver's license reflecting that change,[2] and a copy of the fifth version of the Standards of Care for Gender Identity Disorders adopted by the Harry Benjamin International Gender Dysphoria Association.

## DISCUSSION

### Transsexualism: Medical Aspects

One of the dominant themes of transsexualism,[3] which, to some extent, is reflected in the two letters and the Standards

---

**2.** What authority the Motor Vehicle Administration has to designate on a driver's license, or any other document issued by the Administration, a gender designation different from that recorded on the person's birth certificate is unclear to us. As there was no evidence that the gender designation on petitioner's license was changed and as no one has challenged such a change if one was made, that issue is not directly before us in this case. Because driver's licenses are frequently used and accepted as evidence of identification, however, we strongly suggest that the Administration formally consult with the Office of the Attorney General and give consideration to this Opinion before making such changes.

**3.** Several different terms have been used, and misused, in describing persons whose sexual identity is inconsistent with their assigned gender. We shall use the term "transsexual," notwithstanding that it, too, has been defined in different ways. STEDMAN's MEDICAL DICTIONARY 1865 (27th ed. 2000) defines a "transsexual," in relevant part, as "[a] person with the external genitalia and secondary sexual characteristics of one sex, but whose personal identification and psychosocial configuration is that of the opposite sex." *See also Richards v. United States Tennis*

offered by petitioner, is the belief that sex/gender is not, in all instances, a binary concept—all male or all female. *See* Leslie Pearlman, *Transsexualism as Metaphor: The Collision of Sex and Gender*, 43 BUFFALO L.REV. 835, 842–43 (1995); Julie A. Greenberg, *Defining Male and Female: Intersexuality and the Collision Between Law and Biology*, 41 ARIZ. L.REV. 265, 275–76 (1999). Transsexuals, as petitioner claims to be, seek to achieve recognition of the view that a person's gender/sex is determined by his or her personal sexual identity rather than by physical characteristics alone.[4] Sex reassignment surgery, under that view, merely harmonizes a person's physical characteristics with that identity. *See M.T. v. J.T.*, 140 N.J.Super.

---

*Ass'n*, 93 Misc.2d 713, 400 N.Y.S.2d 267, 270–71 (N.Y.Sup.Ct.1977). That definition, in the context before us in this case, may be too limiting, at least with respect to persons who, as a result of hormone therapy and sex reassignment surgery, have brought their genitalia and some secondary sexual characteristics into conformity with their personal identification. Persons who have undergone those procedures may no longer regard themselves as transsexual but as having achieved a consistent gender. That, however, is the issue. *See* Lori Johnson, *The Legal Status of Post-operative Transsexuals*, 2 HEALTH L.J. 159, 160 (1994). For pure convenience and without implying anything substantive, we shall use the term as descriptive of the person both before and after any medical procedures. Transsexualism has also been referred to as gender dysphoria. It is a condition to be distinguished from transvestism (cross-dressing) and homosexuality (sexual attraction to persons of one's own gender).

4. In the context before us, the terms "sex" and "gender" are not necessarily synonymous for all purposes, and, indeed, the perceived distinctions between them, to some extent, lie at the core of transsexualism. The term "sex" is often used to denote anatomical or biological sex, whereas "gender" refers to a person's psychosexual individuality or identity. *See* Jerold Taitz, *Judicial Determination of the Sexual Identity of Post–Operative Transsexuals: A New Form of Sex Discrimination*, 13 AM. J.L. & MED. 53, 53–54 (1987); Laura Hermer, *Paradigms Revised: Intersex Children, Bioethics & the Law*, 11 ANN. HEALTH L. 195, 200–01 (2002); *see also* Pearlman, *supra*, 43 BUFFALO L. REV. at 835; Francisco Valdes, *Queers, Sissies, Dykes, and Tomboys: Deconstructing the Conflation of "Sex," "Gender," and "Sexual Orientation" in Euro–American Law and Society*, 83 CALIF. L. REV. 3 (1995). Much of the debate concerns whether "gender," which takes greater account of psychological factors, is the more relevant concept deserving of legal recognition. The source material uses both terms and, without implying anything of substance, we shall use the terms interchangeably.

77, 355 A.2d 204, 211 (App.Div.1976) ("In this case the transsexual's gender and genitalia are no longer discordant; they have been harmonized through medical treatment. Plaintiff has become physically and psychologically unified and fully capable of sexual activity consistent with her reconciled sexual attributes of gender and anatomy.").

This Opinion is not intended to be a medical text. Apart from our own incompetence to write such a text, it appears that some of the concepts that underlie the views espoused by transsexuals who seek recognition of gender change are the subject of debate, in both the medical and legal communities. The literature, in both communities, is extensive and daunting, and, unguided by expert testimony, there is no way that we could evaluate it properly. It is, however, necessary to understand those underlying concepts in order to determine what gender is and whether, or how, it may be changed.

There is a recognized medical viewpoint that gender is not determined by any single criterion, but that the following seven factors may be relevant:

(1) Internal morphologic sex (seminal vesicles/prostate or vagina/uterus/fallopian tubes);

(2) External morphologic sex (genitalia);

(3) Gonadal sex (testes or ovaries);

(4) Chromosomal sex (presence or absence of Y chromosome);

(5) Hormonal sex (predominance of androgens or estrogens);

(6) Phenotypic sex (secondary sex characteristics, e.g. facial hair, breasts, body type); and

(7) Personal sexual identity.

*See* Greenberg, *supra*, 41 ARIZ. L.REV. at 278 (citing John Money, SEX ERRORS OF THE BODY AND RELATED SYNDROMES: A GUIDE TO COUNSELING CHILDREN, ADOLESCENTS AND THEIR FAMILIES (2d ed. 1994)); *In re Estate of Gardiner,* 29 Kan.App.2d 92, 22 P.3d 1086 (2001) (citing Greenberg); *Maffei v. Kolaeton Indus.,* 164 Misc.2d 547, 626 N.Y.S.2d 391 (N.Y.Sup.Ct.1995);

*compare Corbett v. Corbett,* [1970] 2 All E.R. 33, 2 W.L.R. 1306 (Probate, Divorce, and Admiralty Div. 1970) (stressing, for purposes of determining the validity of a marriage, only the chromosomal, gonadal, and genital factors); *Attorney General v. Otahuhu Family Court,* [1995] 1 N.Z.L.R. 603 (High Court Wellington, N.Z. 1994) (stressing importance as well of psychological and social aspects of gender); STEDMAN'S MEDICAL DICTIONARY 1626 (27th ed. 2000) (defining "sex").

Blackburn notes that the initial development of a fetus is asexual. SUSAN TUCKER BLACKBURN, MATERNAL, FETAL, & NEONATAL PHYSIOLOGY: A CLINICAL PERSPECTIVE 19–24 (2d ed. 2002). The fetus first forms rudimentary sexual organs—gonads, genital ridge, and internal duct system—that later develop into sexually differentiated organs: testes or ovaries, penis/scrotum or clitoris/labia, and fallopian tubes or seminal vesicles/vas deferens, respectively. This initial differentiation, according to Blackburn, is governed by the presence or absence of a Y chromosome inherited from the father. If present, the Y chromosome triggers the development of testes, which begin to produce male hormones that influence much of the fetus's further sexual development. Those hormones cause the development of male genitalia and inhibit the development of the fetus's primitive fallopian tube system. If the Y chromosome is not present, the fetus continues on what has been characterized as the "default" path of sexual development. The gonads develop into ovaries, and, freed from the inhibiting influence of male hormones, the fetus's primordial duct system develops into fallopian tubes and a uterus.

Most often, it appears, a fetus's sexual development is uneventful, and, because all of the sexual features are consistent and indicate one gender or the other, the person becomes easily identifiable as either male or female. When this development is changed or interrupted, however, the situation may become less clear, and people may be born with sexual features that are either ambiguous (consistent with *either* sex) or incongruent (seemingly inconsistent with their "assigned" sex). *See generally* ALICE DO MURAT DREGER, HERMAPHRODITES AND THE MEDICAL INVENTION OF SEX 35–40 (1998) (summarizing

varieties of sexual ambiguity); Blackburn, *supra*, at 24–28 (discussing physiological anomalies in fetal sexual development); Greenberg, *supra*, 41 ARIZ. L. REV. at 279–90; Claude J. Migeon & Amy B. Wisniewski, *Sexual Differentiation: From Genes to Gender*, 50 HORM. RES. 245 (1998); Selma Feldman Witchel & Peter A. Lee, *Ambiguous Genitalia, in* PEDIATRIC ENDOCRINOLOGY 2d 111 (Mark A. Sperling ed., 2002); Alan J. Schafer & Peter N. Goodfellow, *Sex Determination in Humans*, 18 BIOESSAYS 955, 955–963 (1996); John Money & Anke A. Ehrhardt, MAN & WOMAN, BOY & GIRL: GENDER IDENTITY FROM CONCEPTION TO MATURITY 1–21 (1996).

Individuals who have biological features that are ambiguous or incongruent are sometimes denoted as intersexed or hermaphroditic.[5] *See* Greenberg, *supra*, 41 ARIZ. L. REV. at 283–292 (summarizing plethora of medical conditions where factors contributing to sex determinations are ambiguous or incongruent). The variety of intersexed conditions encompasses virtually every permutation of variance among the seven factors considered in determining gender. These various ambiguities, moreover, may occur both within a specific factor (e.g., ambiguous, unclassifiable genitalia) or between two or more different factors (e.g., chromosomal sex is incongruent with morphological sex). *See* Dreger, *supra*, at 37–38; Greenberg, *supra*, 41 ARIZ. L. REV. at 281–290.

Generally, these conditions are classified into three "theoretical types": male pseudohermaphroditism, female pseudohermaphroditism, and true hermaphroditism. *See generally* Dreger, *supra*, at 35–40, Blackburn, *supra*, at 24–28, Greenberg, *supra*, 41 ARIZ. L.REV. at 281–283. The true hermaphrodite consists of an individual with at least some ovarian tissue and some testicular tissue, and is the most rare. Female pseudohermaphrodites often have XX chromosomes and ovaries, but exhibit "masculinized" external genitalia. The "masculinization" of the genitalia can take many forms, including

---

**5.** Although these terms too are sometimes given distinct meanings within the medical literature, the distinction is unimportant for the purposes of this case. We shall use the terms interchangeably.

the enlargement of the clitoris or swelling of the labia (thus resembling a scrotum).

Male pseudohermaphroditism describes an individual who is chromosomally male (XY) and has testes, but who also has external genitalia that have become feminized. In one condition, called androgen insensitivity syndrome (AIS), the feminization of the genitalia is the result of the body's inability to respond to the developmental influences of androgen. Without the effects of the male hormone, the genitalia develop along the "default" path of feminity. This process continues through puberty, resulting in a person with (undescended) testes and male chromosomes who is very feminine. Because the condition may be detectable only upon an internal examination, it is often undiagnosed until puberty, when the presumed woman fails to menstruate.

A condition that produces similar results is known as 5–alpha–reductase deficiency (5AR). Like AIS, the individual with 5AR deficiency has testes but fails to respond to androgen in the womb, resulting in feminine external genitalia. With the onset of puberty, however, the individual *does* begin to respond to the increased production of testosterone, and the body begins to masculinize. The individual grows tall and muscular, begins to grow facial hair, and the genitals become more masculine. Some of these types of ambiguities, as noted above, may go largely unnoticed by the individual manifesting them, and may go undiagnosed for years.

In other cases, the individual's sexual ambiguity may be the result of a mistaken "sex assignment" at birth. The official designation of a person as male or female usually occurs at or immediately after birth, and is often based on the appearance of the external genitalia. *See* William Reiner, *To Be Male or Female—That is the Question,* 151 ARCHIVES PED. & ADOLESCENT MED. 224 (1997); Milton Diamond & H. Keith Sigmundson, *Sex Reassignment at Birth,* 151 ARCHIVES PED. & ADOLESCENT MED. 298 (1997); Fayek Ghabrial & Saa M. Girgis, *Reorientation of Sex: Report of Two Cases,* 7 INT'L J. FERTILITY 249 (1962). Sometimes, when the genitalia are abnormal,

doctors have erred in determining the baby's sex, mistaking an enlarged clitoris for a small penis, or *vice versa. See* Ghabrial & Girgis, *supra*, at 252. The criteria for determining sex at birth, one researcher has argued, are simply too rudimentary to be entirely accurate. He notes that,

"Past clinical decisions about gender identity and sex reassignment when genitalia are greatly abnormal have by necessity occurred in a relative vacuum because of inadequate scientific data. Clinical decisions have been constructed largely on the predicted adequacy of the genitalia for adult sexual function. But the human may not be so easily deconstructed. Sex chromosome anomalies, gender identity disorder, genital malformations, metabolic adrenal or testicular errors—these conditions imply a sexual plasticity of great complexity."

Reiner, *supra*, at 224.

In the past, it was not uncommon, if a doctor examining the neonatal child observed what appeared to be ambiguous genitalia and concluded that the genitalia so observed would be incapable of functioning in the male capacity, for the doctor to recommend that the child be surgically altered and raised as a girl. *See* Kenneth I. Glassberg, *Gender Assignment and the Pediatric Urologist*, 161 J. UROLOGY 1308 (1999); *see also* Diamond & Sigmundson, *supra*, 151 ARCHIVES PED. & ADOLESCENT MED. at 298; Ghabrial and Girgis, *supra*, 7 INT'L J. FERTILITY at 252; Hermer, *supra*, 11 ANN. HEALTH L. at 196–97; Greenberg, *supra*, 41 ARIZ. L.REV. at 290–91. It was previously believed that a person was psychosexually neutral at birth, and that subsequent psychosexual development was dependent on the appearance of the genitals. Diamond and Sigmundson, *supra*, at 298. Thus, it was assumed, the altered male would psychologically respond, adapt to the new genitalia, and develop into a functional and healthy female.

That view appears no longer to be generally accepted. Individuals who have undergone such surgical alterations as a result of abnormal genitalia often have rejected their "assigned" gender and ultimately request that the alterations be

surgically negated so that they may assume their original gender. *Id.* at 303 ("there is no known case where a 46–chromosome, XY male, unequivocally so at birth, has ever easily and fully accepted an imposed life as an androphilic female regardless of physical and medical intervention."). In this regard, the medical community seems to have concluded that human brains are not psychosexually neutral at birth but are "predisposed and biased to interact with environmental, familial, and social forces in either a male or female mode." *Id.*[6]

The medical community's experience with patients born with ambiguous genitalia has led many researchers to believe that the brain "differentiates" *in utero* to one gender or the other and that, once the child's brain has differentiated, that child cannot be made into a person of the other gender simply through surgical alterations. *See* Diamond & Sigmundson, *supra*, at 303. Some scientists have argued that such medical developments now offer a robust biological explanation of transsexualism—that the brain has differentiated to one sex while the rest of the body has differentiated to another. *See* Frank P.M. Kruijver et al., *Male–to–Female Transsexuals Have Female Neuron Numbers in a Limbic Nucleus*, 85 J. CLIN. ENDOCRINOLOGY & METABOLISM 2034 (2000); *see also*

---

**6.** As a result of this more recent experience and knowledge, doctors and clinicians seem now to be more skeptical about surgical alteration of ambiguous genitalia in very young children. Some doctors and advocates have proposed a moratorium on all surgical reconstruction prior to the patient becoming capable of consenting. *See* Milton Diamond, *Pediatric Management of Ambiguous and Traumatized Genitalia*, 162 J. UROLOGY 1021 (1999). Others argue that surgical alteration of the genitalia should be an absolute last resort, performed only if all available alternatives fail. *See* Glassberg, *supra*, 161 J. UROLOGY at 1309; Melissa Hendricks, *Into the Hands of Babes*, Johns Hopkins Magazine, Sept. 2000, *available at* http://www.jhu.edu/~jhumag/0900web/babes/html (quoting William Reiner, head of Johns Hopkins Gender Identity and Psychosexual Disorders Clinic); *see also* Hazel Glenn Beh & Milton Diamond, *An Emerging Ethical and Medical Dilemma: Should Physicians Perform Sex Assignment Surgery on Infants with Ambiguous Genitalia*, 7 MICH. J. GENDER & L. 1 (2000); Hermer, *supra*, 11 ANN. HEALTH L. at 197–98.

discussion in *Bellinger v. Bellinger,* [2001] EWCA Civ. 1140, [2002] Fam. 150 (C.A. 2001).

Transsexualism was once regarded as a form of sexual or psychological deviance and, in some quarters, is still considered so today. *See, e.g., Hartin v. Bureau of Records,* 75 Misc.2d 229, 347 N.Y.S.2d 515, 518 (N.Y.Sup.Ct.1973) (where the New York Board of Health described sex reassignment surgery as "an experimental form of psychotherapy by which mutilating surgery is conducted on a person with the intent of setting his mind at ease, and that nonetheless, does not change the body cells governing sexuality."); *Corbett v. Corbett,* [1970] 2 All E.R. 33, 2 W.L.R. 1306 (Probate, Divorce, and Admiralty Div. 1970) (finding litigant's transsexualism to be a "psychological abnormality"); *Maggert v. Hanks,* 131 F.3d 670, 671 (7th Cir.1997) (in describing transsexual wishing to undergo sex reassignment surgery, court observed that "[s]omeone eager to undergo this mutilation is plainly suffering from a profound psychiatric disorder.").

Recent studies have suggested that this condition may be associated with certain conditions in the womb and certain processes in the developing pre-natal brain. As noted, there is evidence suggesting that the brain differentiates into "male" and "female" brains, just as the fetus's rudimentary sex organs differentiate into "male" and "female" genitalia. *See* Diamond & Sigmundson, *supra,* 151 ARCHIVES PED. & ADOLESCENT MED. at 303. These studies, the authors assert, "clearly support the paradigm that in transsexuals sexual differentiation of the brain and genitals may go into opposite directions and point to a neurobiological basis of gender identity disorder." *Id.; see also* Kruijver et al., *supra,* 85 J. CLIN. ENDOCRINOLOGY & METABOLISM at 2034; *see also* Jiang–Ning Zhou et al., *A Sex Difference in the Human Brain and its Relation to Transsexuality,* 378 NATURE 68 (1995). Researchers theorize that the developing brain may differentiate in response to hormonal levels in the womb—"intrauterine adrogen exposure." Reiner, *supra,* 151 ARCHIVES PED. & ADOLESCENT MED. at 224. This hypothesis has been tested with animals. *See* John Money, *The Concept of Gender Identity Disorder in*

*Childhood and Adolescence After 39 Years,* 20 J. Sex &
Marital Therapy 163, 170 (1994). Research has indicated, for
instance, that the sexual differentiation of primates may be
manipulated by controlling prenatal hormone exposure. *See*
Robert W. Goy et al., *Behavioral Masculinization is Indepen-
dent of Genital Masculinization in Prenatally Androgenized
Female Rhesus Macaques,* 22 Hormones & Behavior 552
(1988). Such experimental results have been cited by at least
one court. *See Doe v. McConn,* 489 F.Supp. 76, 78 (S.D.Tex.
1980) (describing the results of experiments discussed above).

The studies imply that transsexualism may be more similar
to other physiological conditions of sexual ambiguity, such as
androgen insensitivity syndrome, than to purely psychological
disorders. Reiner posits:

"What can be stated is that the absence of prenatal andro-
gen exposure, whether a child is XX, XO, has an androgen
insensitivity syndrome, and so on, may render the brain to
the default, or female, position. Within the potential for
transformation from the default brain to the virilized brain
is the opportunity for errors of incomplete or improperly
timed androgen exposure. Such errors, in addition to ac-
quired, sometimes iatrogenic, post-natal injuries ... may
lead to the misassignment or reassignment of sex at birth
from the genetic sex."

Reiner, *supra,* 151 Archives Ped. & Adolescent Med. at 225.
The ultimate conclusion of such studies, which, as noted, is the
central point sought to be made by transsexuals, is that the
preeminent factor in determining gender is the individual's
own sexual identity as it has developed in the brain. Reiner
continues:

"In the end it is only the children themselves who can and
must identify who and what they are. It is for us as
clinicians and researchers to listen and to learn. Clinical
decisions must ultimately be based not on anatomical pre-
dictions, nor on the 'correctness' of sexual function, for this
is neither a question of morality nor of social consequence,
but on that path most appropriate to the likeliest psychosex-

ual developmental pattern of the child. In other words, the organ that appears to be critical to psychosexual development and adaptation is not the external genitalia, but the brain."

Reiner, *supra,* at 225.

Regardless of its cause, the accounts from transsexuals themselves are startlingly consistent. *See, e.g., In re Estate of Gardiner,* 42 P.3d 120 (Kan.2002); *Littleton v. Prange,* 9 S.W.3d 223, 224 (Tex.Ct.App.1999); *M.T. v. J.T.,* 140 N.J.Super. 77, 355 A.2d 204, 205 (App.Div.1976). They grow up believing that they are not the sex that their body indicates they are. They believe that they have mistakenly grown up with the wrong genitalia. These disconcerting feelings often begin early in childhood, as early as three or four years. *See, e.g., Littleton, supra,* 9 S.W.3d at 224; *M.T., supra,* 355 A.2d at 205 (where the expert witness testified that "[t]here was ... 'very little disagreement' on the fact that gender identity generally is established 'very, very firmly, almost immediately, by the age of 3 to 4 years.'"); *Doe v. McConn,* 489 F.Supp. 76, 78 (S.D.Tex.1980) ("Most, if not all, specialists in gender identity are agreed that the transsexual condition establishes itself very early, before the child is capable of elective choice in the matter"). These individuals often rebel against any attempt to impose social gender expectations that are inconsistent with what they believe they are-they may refuse to wear the "appropriate" clothes and refuse to participate in activities associated with their assigned gender. *See, e.g., M.T., supra,* 355 A.2d at 205; *see also* Diamond & Sigmundson, *supra,* 151 ARCHIVES PED. & ADOLESCENT MED. at 299–301. That kind of behavior has become one of the determining factors for a diagnosis of gender identity disorder.

A transsexual wishing to transition to a different gender has limited options. *See* HARRY BENJAMIN INTERNATIONAL GENDER DYSPHORIA ASSOCIATION, STANDARDS OF CARE FOR GENDER IDENTITY DISORDERS (5th ed. 1998). Generally, the options consist of psychotherapy, living as a person of the desired sex, hormonal treatment, and sex reassignment surgery. Although psychotherapy may help the transsexual deal with the psychological

difficulties of transsexualism, courts have recognized that psychotherapy is not a "cure" for transsexualism. *McConn, supra,* 489 F.Supp. at 78. Because transsexualism is universally recognized as inherent, rather than chosen, psychotherapy will never succeed in "curing" the patient:

> "Most, if not all, specialists in gender identity are agreed that the transsexual condition establishes itself very early, before the child is capable of elective choice in the matter, probably in the first two years of life; some say even earlier, before birth during the fetal period. These findings indicate that the transsexual has not made a choice to be as he is, but rather that the choice has been made for him through many causes preceding and beyond his control. Consequently, it has been found that attempts to treat the true adult transsexual psychotherapeutically have consistently met with failure."

*McConn, supra,* 489 F.Supp. at 78.

Hormonal treatment has been shown to be more effective, and, for the male-to-female transsexual, results in breast growth, feminine body fat distribution, a decrease in body hair, and softening of the skin. Although most of these effects are reversible upon termination of the treatment, the individual's breast growth may not reverse entirely. Hormonal treatment for female-to-male transsexuals results in deepening of the voice, enlargement of the clitoris, breast atrophy, increased upper body strength, weight gain, increased facial and body hair, baldness, increased sexual arousal, and decreased hip fat.

Surgical options for the male-to-female transsexual include orchiectomy (removal of gonads), vaginoplasty (construction of vagina), and mammoplasty (construction of breasts). Jerold Taitz, *Judicial Determination of the Sexual Identity of Post-operative Transsexuals: A New Form of Sex Discrimination,* 13 AM. J.L. & MED. 53, 55–56 (1987). Some patients elect to undergo additional cosmetic surgeries to enhance other secondary sex features, such as facial structure or voice tone. Surgical options for the female-to-male transsexual include

mastectomy, hysterectomy, vaginectomy, and phalloplasty. As most health insurance companies currently exclude coverage for transsexual treatment, the out-of-pocket cost is often prohibitively expensive. Taitz, *supra*, at 55–56; *Maggert v. Hanks*, 131 F.3d 670, 672 (7th Cir.1997). One commentator has asserted that a male-to-female operation costs an average of $37,000, whereas the average female-to-male operation costs $77,000. Aaron C. McKee, *The American Dream—2.5 Kids and a White Picket Fence: The Need for Federal Legislation to Protect the Insurance Rights of Infertile Couples,* 41 WASH-BURN L.J. 191, 198 (2001). Another estimate describes the cost as "easily reach[ing] $100,000." *Maggert, supra,* 131 F.3d at 672. Contributing to the much higher cost of female-to-male sex reassignment surgery is the increased technical difficulty of phalloplasty, estimates for which range from $30,000 to $150,000. *See* Shana Brown, *Sex Changes and "Opposite Sex" Marriage: Applying the Full Faith and Credit Clause to Compel Interstate Recognition of Transgendered Persons' Amended Legal Sex for Marital Purposes,* 38 SAN DIEGO L. REV. 1113, 1127 n. 79 (2001); Patricia A. Cain, *Stories From the Gender Garden: Transsexuals and Anti–Discrimination Law,* 75 DENV. U.L. REV. 1321, 1334 n. 59 (1998). The procedure may require several operations.

Estimates of the number of intersexed individuals vary considerably, from 1 per 37,000 people (*see* Taitz, *supra,* 13 AM. J.L. AND MED at 56) to 1 per 2,000 (*see* Hermer, *supra,* 11 ANN. HEALTH L. at 195) to as high as 3 per 2,000 (*see* Dreger, *supra,* at 42). It seems to be a guess, although Dreger suggests that "the frequency of births in which the child exhibits a condition which today could count as 'intersexual' or 'sexually ambiguous' is significantly higher than most people outside the medical field (and many inside) assume it is." Dreger, *supra,* at 42.

In reviewing the medical literature, we have avoided making pronouncements of our own, but have simply recounted some of the assertions and conclusions that appear in that literature—assertions and conclusions which, when presented in the form of testimony in court, have evoked differing responses

from the courts, both in the United States and elsewhere. Notwithstanding that this remains an evolving field, in which final conclusions as to some aspects may be premature, the current medical thinking does seem to support at least these relevant propositions: (1) that external genitalia are not the sole medically recognized determinant of gender; (2) that the medically recognized determinants of gender may sometimes be either ambiguous or incongruent; (3) that due to mistaken assumptions made by physicians of an infant's ambiguous external genitalia at or shortly after birth, some people are mislabeled at that time as male or female and thereafter carry an official gender status that is medically incorrect; (4) that at least some of the medically recognized determinants of gender are subject to being altered in such a way as to make them inconsistent with the individual's officially declared gender and consistent with the opposite gender; and (5) whether or not a person's psychological gender identity is physiologically based, it has received recognition as one of the determinants of gender and plays a powerful role in the person's psychic makeup and adaptation.

For our purposes, the relevance of these propositions lies in the facts that (1) gender itself is a fact that may be established by medical and other evidence, (2) it may be, or possibly may become, other than what is recorded on the person's birth certificate, and (3) a person has a deep personal, social, and economic interest in having the official designation of his or her gender match what, in fact, it always was or possibly has become.[7] The issue then becomes the circumstances under which a court may declare one's gender to be other than what is officially recorded and the criteria to be used in making any such declaration.

---

7. Indeed, that interest has received recognition as a "right" under the European Convention for the Protection of Human Rights and Fundamental Freedoms. *See Goodwin v. United Kingdom,* [2002] 2 FCR 577, 67 BMLR 199 (European Court of Human Rights (Grand Chamber) 2002).

### *Jurisdiction of Circuit Court*

■ In construing petitioner's action as one for declaratory judgment, the Court of Special Appeals in effect created a straw man of its own and then, to petitioner's detriment, knocked it down. It concluded that "[s]ince the petition sought a general order changing appellant's legal sexual identity, such relief must be categorized as a declaratory judgment" and then found that, as no one contested the relief sought by petitioner, there was no justiciable controversy, which is a prerequisite to a declaratory judgment action. The court went on to rule that, because a remedy was not currently available to petitioner under the Declaratory Judgment Act, the Circuit Court had no jurisdiction in the matter.

We agree that, in the circumstances of this case, a declaratory judgment would have been inappropriate, as no one has contested petitioner's claim that he had successfully transitioned to become a woman and was entitled to be declared as such. Although § 3–403(a) of the Courts and Judicial Proceedings Article gives broad authority to the Circuit Court to "declare rights, status, and other legal relations whether or not further relief is or could be claimed," § 3–409, which governs the appropriateness of declaratory relief in a civil action not founded specifically on a contract, deed, trust, will, land patent, statute, or administrative regulation, authorizes the court to grant a declaratory judgment if it will terminate the uncertainty or controversy giving rise to the proceeding *and* (1) an actual controversy exists between contending parties, (2) antagonistic claims are present between the parties which indicate imminent and inevitable litigation, or (3) a party asserts a legal relation, status, right, or privilege that is challenged or denied by an adverse party. None of those conditions exist here. *See Tanner v. McKeldin,* 202 Md. 569, 576–77, 97 A.2d 449, 452 (1953).

We do not agree, for declaratory judgment purposes, that the lack of an actual contest involving an adverse party is a *jurisdictional* defect, as contrasted to one that simply makes relief under the Declaratory Judgment Act inappropriate, but

the end result, with respect to a declaratory judgment proceeding, is the same. *See Reyes v. Prince George's County,* 281 Md. 279, 380 A.2d 12 (1977); *compare Harford County v. Schultz,* 280 Md. 77, 371 A.2d 428 (1977).

Of greater importance, we disagree with the intermediate appellate court's conclusion that there is no other basis of jurisdiction to consider the petition and, should the case for it be made, to grant the relief requested by petitioner. This was not an action under the Declaratory Judgment Act, and, although had there been an actual contest, the relief sought by petitioner could, if warranted by the evidence, be afforded under that Act, the petitioner's right to seek that relief is not limited to or dependent upon the Declaratory Judgment Act. The Circuit Court has Constitutionally-based, and statutorily recognized, equitable jurisdiction to consider and rule upon the petition.

Article IV, § 20 of the Maryland Constitution provides for a Circuit Court in Baltimore City and each of the State's 23 counties, and it vests those courts, within their respective geographic boundaries, with "all the power, authority and jurisdiction, original and appellate, which the Circuit Courts of the counties exercised on [November 4, 1980] and the greater or lesser jurisdiction hereafter prescribed by law." Implementing that Constitutional provision, the General Assembly has provided in Maryland Code, § 1–501 of the Courts and Judicial Proceedings Article, that the Circuit Courts "are the highest common-law and equity courts of record exercising original jurisdiction within the State" and that each has "full common-law and equity powers and jurisdiction in all civil and criminal cases within its county, and all the additional powers and jurisdiction conferred by the Constitution and by law, except where by law jurisdiction has been limited or conferred exclusively upon another tribunal."

Equity jurisdiction initially encompassed the enforcement of rights not otherwise enforceable, and the provision of remedies not otherwise available, in the common law courts-appeals to Justice. Over time, the initial scope of that jurisdiction has

expanded; many of the actions, rights, and remedies now recognized as within the domain of the equity courts were not there in the beginning but were added through the historical development and expansion of equity jurisprudence, often by statute. As Justice Story observed, "[e]very just order or rule known to equity courts was born of some emergency, to meet some new conditions, and was, therefore, in its time, without a precedent." 1 JOSEPH STORY, COMMENTARIES ON EQUITY JURIS-PRUDENCE § 95 at 96 (14th ed. 1918). *See also Wentzel v. Montgomery Gen. Hosp.*, 293 Md. 685, 706, 447 A.2d 1244, 1255 (1982), where Judge Smith, in a concurring and dissenting opinion, quoted approvingly from C. Phelps, JURIDICAL EQUITY 213 (1894) that "[e]quity ... recognizes new adjustments for new situations, not upon a dogmatic basis, but upon principles which address themselves to the conscience and intelligence, and therefore admit of a rational and progressive development."

Among the categories of remedies that were added over time were those that establish, declare, alter, or terminate some aspect of personal legal status. Professor Pomeroy notes that those kinds of remedies were not part of the original jurisdiction of chancery and were added largely (though not entirely) by statute. 1 JOHN N. POMEROY, A TREATISE ON EQUITY JURISPRUDENCE, § 112 at 149 (5th ed. 1941). Pomeroy lists as examples within that category actions for divorce or annulment of marriage and proceedings to declare a person of unsound mind or a habitual drunkard.

There are, indeed, a number of actions over which the equity courts in Maryland have been given jurisdiction that (1) establish, define, declare, alter, or terminate the personal or legal status of an individual, (2) may or may not be contested, and (3) may or may not be cognizable under the Declaratory Judgment Act. The most common is that of divorce, which is specifically excluded from the Declaratory Judgment Act. *See* Md.Code, § 3–409(d) of the Courts and Judicial Proceedings Article. In England, actions for divorce were within the jurisdiction of the Ecclesiastical courts, not the Chancery Court; in Maryland, until 1841, they fell within the exclusive

jurisdiction of the General Assembly which, in that regard, assumed the role of the Ecclesiastical court. Concurrent jurisdiction over divorce actions was first placed in the equity courts in Maryland in 1841 (*see* 1841 Md. Laws, ch. 262), and not until the Constitution of 1851 expressly terminated the power of the Legislature to grant divorces did equity jurisdiction over divorce become exclusive. *See Thomas v. Thomas,* 294 Md. 605, 611, 451 A.2d. 1215, 1218 (1982). The equity courts also have statutorily-granted jurisdiction over actions to annul a marriage and over the custody of children. *See* § 1–201 of the Family Law Article.

Actions to declare a person disabled and to appoint a guardian for the person or property of such a person are within the jurisdiction of equity courts. *See* Maryland Code, title 13 of the Estates and Trusts Article. Paternity actions under § 5–1005 of the Family Law Article and actions under § 1–208 of the Estates and Trusts Article by a putative father to declare his parentage are filed in the equity courts. Courts of equity have jurisdiction to terminate parental rights, subject to Constitutional constraints and upon the conditions set forth by the Legislature, and to enter judgments of adoption. *See* title 5, subtitle 3 of the Family Law Article. They have jurisdiction to consider and grant petitions by persons to change their names. *See* Maryland Rule 15–901. When acting as a juvenile court, the Circuit Court exercises equitable jurisdiction and, pursuant to that jurisdiction, may declare a child delinquent or in need of assistance or supervision.

If a person can show that his or her name or date of birth, as it appears on the person's birth certificate, is incorrect and the Secretary of Health and Mental Hygiene, for whatever reason, refuses to make the correction absent a court order (even if the Secretary does not contest the person's evidence), we have no doubt that a Circuit Court, exercising its equity jurisdiction, could entertain a complaint and, if satisfied that the document was, indeed, mistaken, order a change. All of these kinds of actions relate principally to the legal status or identification of an individual, and, while often contested, they are often uncontested and declaratory in nature. There is

nothing extraordinary about equity jurisdiction in these kinds of matters. In some instances, the equitable relief might be available in a declaratory judgment action, if the statutory requisites for such an action exist, but the availability or non-availability of that form of action does not define or limit the extent of equity jurisdiction. The function of the Declaratory Judgment Act was to supplement, not limit, the remedies available at law or equity. *See Schultz v. Kaplan,* 189 Md. 402, 409, 56 A.2d 17, 20 (1947); *Himes v. Day,* 254 Md. 197, 206, 254 A.2d 181, 186 (1969).

The statute referenced by petitioner— § 4–214(b)(5) of the Health–General Article—has significant relevance in this regard. It provides that "[u]pon receipt of a certified copy of an order of a court of competent jurisdiction indicating the sex of an individual born in this State has been changed by surgical procedure and whether such individual's name has been changed, the Secretary shall amend the certificate of birth of the individual as prescribed by regulation." Although petitioner was not seeking relief under that statute and, because he was not born in Maryland and has no Maryland birth certificate, would not be entitled to relief under it, the statute, along with other statutes in the subtitle of which it is a part, evidences a clear recognition by the General Assembly that a person's gender can be changed and that there are courts with jurisdiction to consider and determine whether that has occurred.

Section 4–214(b)(5) was enacted in 1995 as part of a more comprehensive revision of the laws relating to vital records. *See* 1995 Md. Laws, ch. 97. It derives, almost verbatim, from § 21(e) of a Model State Vital Statistics Act developed by the U.S. Department of Health, Education, and Welfare (HEW) in 1977 and revised in 1992. Although neither the Department of Health and Human Services (HHS)—the successor agency to HEW—nor the Library of Congress appear to have any records relating to the development of § 21(e) of the Model Act, a 1997 HHS publication indicates that a Model Act dealing with vital records was first proposed, by the Bureau of the Census, in 1907 and that updated versions were approved

in 1942, 1959, 1977, and 1992. *See U.S. Vital Statistics System Major Activities and Developments, 1950–95,* U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics, at 5–6 (1997). The major thrust of the 1977 proposal was to create a centralized system in each State for the collection, processing, registration, and certification of vital records, rather than to continue to have this important function carried out disparately by local offices. *Id.* at 6. The 1992 revision was intended to produce a practical model that "most States could adopt with few modifications," that would be flexible enough to accommodate new technologies. *Id.*

The 1977 version of the proposed Model Act, which was approved by the Association of State and Territorial Health Officials, the American Association for Vital Records and Public Health Statistics, and the United States Public Health Service, contains no specific commentary with respect to § 21(e). It does note, however, that, among the purposes of the proposed Act, were "[t]o incorporate current social customs and practices and current technology into the policies and procedures of the vital statistics system in the various States," to promote uniformity of those policies and procedures so that vital records will be acceptable everywhere as prima facie evidence of the facts recorded, and to enhance the level of comparability of vital statistics data among the States.

There is very little legislative history available with respect to the 1995 Maryland enactment. The House and Senate Committees that considered the measure (House Bill 1068) expressly noted the provision in § 4–214(b)(5). The Bill Analysis prepared for the House Environmental Matters Committee states that "[w]hen the Secretary receives an order from a court of competent jurisdiction that an individual born in Maryland has had a sex change operation, and indicates a name change, the birth certificate must be amended per regulation." The Bill Analysis prepared for the Senate Economic and Environmental Affairs Committee contains similar language. The Senate Committee also noted that the bill was intended to assure that the Maryland law "reflects legal

mandates recommended in the Model Act which is published by the U.S. Department of Health and Human Services as a guide for vital records health statistics programs nationally."

It appears that 22 States and the District of Columbia have enacted statutes expressly enabling a person who has undergone a change in gender to have his or her birth certificate amended to reflect the change. Most of those statutes require a court order based on evidence of a surgical procedure, although a few allow an amendment without a court order and three do not require a surgical procedure.[8] About 20 States have statutes dealing generally with amendments to birth certificates but which do not speak expressly, one way or the

---

8. See ALA CODE, § 22–9A–19 (2002) (order of court of competent jurisdiction and surgery required); ARIZ REV STAT § 36–326 (2001) (change may be made based on sworn statement from licensed physician attesting to either surgical operation or chromosomal count, although registrar may require further evidence); ARK CODE ANN § 20–18–307 (2002) (order of court of competent jurisdiction and surgery required); CAL. HEALTH & SAFETY CODE § 103425, 103430 (2002 Supp.) (court order and surgery apparently required); COL REV STAT ANN. § 25–2–115 (2002) (same); D.C. CODE ANN § 7–217 (2002) (same); GA CODE ANN. § 31–10–23 (2002) (same); HAW REV STAT § 338–17.7 (2002) (physician affidavit and surgery required; registrar can require additional information); 410 ILL COMP STAT 535/17 (2002) (same); IOWA CODE § 144.23 (2002) (physician affidavit and surgery "or other treatment"); LA REV STAT. ANN § 40:62 (2002) (order of court of competent jurisdiction and surgery required); MASS. ANN LAWS ch. 46, § 13 (2002) (same); MICH COMP LAWS § 333.2831 (2002) (affidavit of physician certifying sex reassignment surgery); MISS CODE ANN. § 41–57–21 (2001) (registrar may correct certificate that contains incorrect sex on affidavit of two persons having personal knowledge of facts; not clear whether restricted to initial error in certificate or includes gender change); MO. REV STAT § 193.215 (2001) (order of court of competent jurisdiction and surgery required); NEB REV.STAT. § 71–604.1 (2002) (affidavit of physician as to sex reassignment surgery and order of court of competent jurisdiction changing name required); N.J. STAT. ANN. 26:8–40.12 (2002) (certificate from physician attesting to surgery and order of court of competent jurisdiction changing name); N.M. STAT ANN. § 24–14–25 (2002) (same); N.C. GEN.STAT. 130A–118 (2001) (affidavit of physician attesting to sex reassignment surgery); OR REV STAT § 432.235 (2001) (order of court of competent jurisdiction and surgery required); UTAH CODE ANN. § 26–2–11 (2002) (order of Utah District Court or court of competent jurisdiction of another State required; no specific requirement of surgery); VA CODE ANN. § 32.1–269 (2002) (order of court of competent jurisdic-

other, to gender changes. Only one State—Tennessee—statutorily forbids a change in birth certificate by reason of gender change. *See* TENN.CODE ANN. § 68–3–203 (2002).

Viewed against this background, it is clear that, in enacting § 4–214(b)(5), the Legislature necessarily recognized the jurisdiction of the Circuit Courts to consider and grant petitions to declare a change in gender; indeed, that section could have no other rational meaning. The statute directs the Secretary to amend a birth certificate upon a court order declaring that, as a result of surgery, a gender change has occurred. It does not purport to grant any new jurisdiction to the Circuit Courts—the only courts that would otherwise be competent to enter such an order—and therefore must be taken as a recognition that such jurisdiction already existed.

That conclusion finds support not only in the history of the legislation—its derivation from a Model Act and the relatively consistent enactments by many other States—but also from other provisions in the Maryland Act. Both the Model Act and the Maryland statute anticipate and recognize a number of different kinds of court orders that affect vital records. Section 4–211(a), for example, requires the Secretary of Health and Mental Hygiene to issue a new birth certificate for an individual upon receiving proof that "[a] court of competent jurisdiction has entered an order as to the parentage, legitimation, or adoption of the individual." Section 4–211(b) permits the Secretary to issue a new birth certificate for a person born outside the United States upon receipt of such an order. Section 4–211(i) requires the Secretary, on request, to prepare and register a certificate for a non-citizen born in a foreign country who is adopted "through a court of competent jurisdiction in this State." Section 4–214(c)(1) requires the Secretary to change the name on a birth certificate on receipt of a court order that changes the name of an individual who was born in this State. As noted, those kinds of orders, commonly

___

tion indicating sex has been changed by "medical procedure"); WIS. STAT. § 69.15 (2001) (order of court or administrative order).

issued by the Circuit Courts, also are declaratory of a change in a person's legal status or identification.

The fact that § 4–214(b)(5) directly operates only with respect to a Maryland birth certificate does not detract in the least from the legislative recognition of jurisdiction to entertain and grant petitions such as the one before us. Obviously, the Legislature cannot direct officials in other States to change birth certificates issued in those States but may deal only with birth certificates issued or issuable in Maryland, and that is the thrust of the statute. The jurisdiction of Maryland courts is not limited by the birthplace of the parties seeking relief, however, so by recognizing the authority of the Circuit Courts to enter gender-change declarations with respect to persons born in Maryland, it necessarily recognizes as well their jurisdiction to enter such orders on behalf of anyone properly before the court. Indeed, any other conclusion would raise serious Constitutional issues under the Equal Protection and Privileges and Immunities Clause of the 14th Amendment to the United States Constitution.

As should be evident, we do not rest our holding that the Circuit Court had jurisdiction over Mr. Heilig's petition solely on the basis of § 4–214(b)(5), but rather on the conclusion that his action fell within the general equity jurisdiction of the court. Section 4–214(b)(5) simply recognizes the existence of that jurisdiction. *Nor do we opine on what the collateral effect of any judgment attesting to a change in gender might be.*[9] We hold only that the court had jurisdiction to consider

---

**9.** As pointed out in *Goodwin v. United Kingdom,* [2002] 2 FCR 577, 67 BMLR 199 (Eur. Ct. H.R. (Grand Chamber) 2002), the issue of a transsexual's true gender can arise in many different contexts and have a wide variety of collateral consequences. It may affect or determine, for example, the validity of a marriage, whether a birth certificate may be amended, entitlement to pension or insurance rights that distinguish by gender, whether distinctions in employment are, as to a particular individual, permissible or unlawful, application of the law of rape or other offenses in which gender may be an element or issue, medical treatment and housing assignment upon incarceration or other institutional confinement, entitlement to participate in certain amateur or professional sports (*see Richards v. United States Tennis Ass'n,* 93

Misc.2d 713, 400 N.Y.S.2d 267 (N.Y.Sup.Ct.1977)), and housing and work assignments available for persons in military service. In Comment, *Transsexuals in Limbo: The Search for a Legal Definition of Sex*, 31 MD. L. REV. 236, 247–51 (1971), the unnamed author noted the possible effect of gender change on various estate and trust issues, questioning, for example, whether a male to female transsexual would still qualify for a legacy to the testator's "son."

Most cases in which the gender of a transsexual is at issue have arisen in the context of marriage, and the prevailing sentiment in the United States seems to be that, absent legislation to the contrary, marriage between a transsexual and a person of the transsexual's initial assigned gender is not permitted, even when the transsexual has undergone surgery. Many of the courts expressing that view have followed the lead of the English court in *Corbett v. Corbett*, [1970] 2 All E.R. 33, 2 W.L.R. 1306 (Probate, Divorce, and Admiralty Div. 1970), which initially set the law for England in this regard. Based on the medical evidence presented in that case, the Corbett court concluded that "the biological sexual constitution of an individual is fixed at birth (at the latest), and cannot be changed, either by the natural development of organs of the opposite sex, or by medical or surgical means," and "[t]he only cases where the term 'change of sex' is appropriate are those in which a mistake as to sex is made at birth and subsequently revealed by further medical investigation." *See In re Ladrach*, 32 Ohio Misc.2d 6, 513 N.E.2d 828 (Probate Ct.1987). In *Frances B. v. Mark B.*, 78 Misc.2d 112, 355 N.Y.S.2d 712 (N.Y.Sup.Ct.1974), the court based its rejection of a marriage on the fact that, under New York law, physical incapacity for a sexual relationship was a ground for annulment. It thus concluded that, as a female to male transsexual, even after surgery, was incapacitated in that regard, the transsexual's marriage to a woman was invalid. *See also Littleton v. Prange*, 9 S.W.3d 223 (Tex.Ct. App.1999) (biologically, post-operative female transsexual still a male); *In re Estate of Gardiner*, 42 P.3d 120 (Kan.2002) (same); *but compare M.T. v. J.T.*, 140 N.J.Super. 77, 355 A.2d 204 (App.Div.1976) (rejecting Corbett and recognizing as valid a marriage involving post-operative transsexual).

The holding in *Corbett* was reexamined but confirmed in England in *Bellinger v. Bellinger*, [2001] EWCA Civ. 1140, [2002] Fam. 150 (C.A. 2001). That view is not shared in other countries, however, including at least two that are regarded as common law countries. Australia and New Zealand recognize such marriages when the transsexual has undergone surgery. *See In re Kevin*, 28 Fam. L.R. 158 (Family Ct. of Australia 2001); *Attorney General v. Otahuhu Family Court*, [1995] 1 N.Z.L.R. 603 (High Court Wellington, N.Z. 1994). In *Goodwin v. United Kingdom, supra* [2002] 2 F.C.R. 577, 67 BMLR 199 (Eur. Ct. H.R. (Grand Chamber) 2002), the European Court of Human Rights noted a report indicating that 20 European countries (Austria, Belgium, Denmark, Estonia, Finland, France, Germany, Greece, Iceland, Italy, Latvia, Luxembourg, the Netherlands, Norway, Slovakia, Spain, Sweden, Switzerland, Turkey, and the Ukraine) also permitted a post-operative transsexual to marry a person of his/her original gender and concluded that England's refusal to recognize such marriages violated the personal rights of the transsexual under Articles 8 and 12 of the

 

and rule upon the petition.[10]

## *What Must Be Shown?*

Most courts and other agencies that have dealt with establishing the gender of transsexuals have done so in particular contexts and have set the requirements for such recognition accordingly. To warrant amending a birth certificate, Maryland (and most States that permit such a change at all) requires by statute a finding that gender *has been changed* "by surgical procedure." [11] Those courts that have permitted transsexuals to marry someone of their former gender have also uniformly required surgery as a condition to recognizing a change in gender.

Surgery seems to be a requirement for recognition of gender change in other contexts as well. The Social Security Administration apparently will alter its records to record a change of gender but requires "[c]linical or medical records or other combination of documents showing the sex change surgery has been completed." *See SSA Program Operations*

---

Convention for the Protection of Human Rights and Fundamental Freedoms (Art. 8: Everyone has the right to respect for his private ... life; Art. 12: Men and women of marriageable age have the right to marry and to found a family, according to the national laws governing the exercise of this right).

This is an issue that is not before us in this case and upon which we express no opinion.

10. The question may be raised, of what use is a judgment declaring that a person's gender has been changed if we do not specify the effect of such a judgment? The answer is that courts rarely specify the collateral effect of their judgments, unless it is raised as a justiciable issue. The question in a case, ordinarily, is simply whether a party is entitled to the judgment, not what the party may do with it. What effect a judgment has depends on the law governing what the judgment holder seeks to do, and that is true in this regard as well.

11. It appears to be undisputed that no surgery, however extensive, can make a transsexual fertile in his/her "new" gender. Neither male-to-female nor female-to-male transsexuals are capable of conceiving children once sex reassignment surgery has been completed. The fact that § 4–214(b)(5) recognizes that surgery *can* effect a change in gender indicates, at least in the context of amending birth certificates, that infertility is not a basis for refusing to recognize the change.

*Manual System RM 00203.210 (Changing Numident Data),*
§ C at 4. For a similar requirement in other social security
systems, *see Department of Social Security v. SRA,* 118
A.L.R. 467 (Fed.Ct.Australia, Gen.Div.1993) (for purposes of
receiving social security benefits under Australian law as wife
of disabled pensioner). In the Federal prison system, pre-
operative transsexuals are housed with inmates of their birth
gender, but post-operative transsexuals are housed with in-
mates of their acquired gender. *See Farmer v. Haas,* 990
F.2d 319, 320 (7th Cir.1993). It has been reported, although
there seems to be no official documentation, that the State
Department will issue a temporary passport with a change of
gender upon a certified letter from a physician stating that the
applicant is about to undergo sex reassignment surgery and
will issue a regular new passport showing such a change upon
a certified letter stating that the applicant has undergone such
surgery. *See* Greenberg, *supra,* 41 ARIZ. L. REV. at 315.

The statutes or regulations that make surgery a condition to
recognition of gender change rarely, if ever, specify the kind
of surgery that will suffice, although in the court cases there is
usually considerable evidence regarding the nature and effect
of any surgery that is undertaken and both the medical and
legal literature describe it as well. The point, or relevance, of
the requirement of surgery seems to lie in the assumption
that, if the person has undergone sex reassignment surgery,
the change has been effected, in that at least (1) the person's
external genitalia have been brought into consistency with
that indicative of the new gender and with other determinants
of gender, and (2) the change is regarded as permanent and
irreversible. Hormonal therapy alone, which usually can be
terminated or perhaps even reversed, has not, to our knowl-
edge, been recognized as effecting either a sufficient change or
a permanent one.

Almost all courts have recognized that the question of
whether and how gender can be changed is one where the law
depends upon and, to a large extent, must follow medical facts
(medical facts, in this context, to include relevant psychological
facts). Any reasoned legal conclusion respecting an asserted

change in one's gender must therefore be based on admissible evidence of medical fact—the factors that actually should be considered in determining gender and what the person's gender status is when viewed in the context of those factors. We have examined the literature available to us and recounted some of the evidence that other courts have found relevant, but only to establish the basis for our conclusion that the court has jurisdiction over petitions seeking recognition of gender change. None of what we have recounted is evidence in this case and therefore does not establish, by itself, petitioner's entitlement to the order he seeks.

This is, clearly, an evolving area. As noted, aside from the two unsworn letters attached to the petition and the Standards of Care of the Harry Benjamin International Gender Dysphoria Association, no medical evidence was presented to the Circuit Court with respect to petitioner's gender status. Because we believe (1) that the court had jurisdiction to consider the petition, and (2) that, on the record before it, the court erred in broadly concluding, apparently as a matter of law, that gender was not subject to modification or adjustment, we shall direct that the case be remanded for the court to consider admissible evidence relevant to the issue and to make a determination of whether the relief requested by petitioner should be granted based on that evidence. As the seeker of relief, petitioner has the burden of establishing his entitlement to it, and it will therefore be incumbent upon him to present sufficient medical evidence of both the relevant criteria for determining gender and of the fact that, applying that criteria, he has completed a permanent and irreversible change from male to female.

JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE JUDGMENT OF CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND CASE TO THAT COURT FOR FURTHER PROCEEDINGS IN CONFORMANCE WITH THIS OPINION; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.